UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\------------------------------------------------------------ X

| | | | | |
|---|---|---|---|---|
| KELLY MACNEAL, | | : | | |
| | Plaintiff, | : | 23    Civ.    5890 | |
| | | : | | |
| -against- | | : | | |
| | | : | AMENDED COMPLAINT | |
| THE CITY OF NEW YORK, | | : | | |
| | Defendant(s), | : | | |

\------------------------------------------------------------ X

Plantiff, Kelly MacNeal, complaining of the Defendant(s), The City Of New York and those agents and officers, named here in, employed by and/or acting in an official capacity for The City of New York, alleges as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.  Plaintiff, Kelly MacNeal, brings this action *pro se.*

2.  Plaintiff brings this action against the City of New York for its municipal liability in (i) the New York City Commission on Human Rights (CCHR), (ii) SAPNA RAJ, in her official capacity as Deputy Commissioner of the New York City Commission on Human Rights, (iii) JACQUELINE RIOS, in her official capacity as Agency Attorney at the New York City Commission on Human Rights, (iv), John Doe (1-8) in their capacity as New York City Police Department officers and (v) Jane Doe and John Doe in their capacity of New York City Fire Department Bureau of Emergency Medical Services personnel.

3.  Plaintiff bring this action to remedy Defendants' unlawful racial discrimination, failure to render service, misrepresenting the law under color of law and acting in a retaliatory manner toward the Plaintiff.

4.  Plaintiff seek punitive and compensatory damages for physical pain and suffering sustained and endured due to Defendants' failure to enforce ADA and FHA laws and offer proper legal protection to Plaintiff.

5.  Plaintiff further seeks punitive and compensatory damages for extreme emotional distress and damage to reputation.

## **PARTIES**

6.  Plaintiff, Kelly MacNeal, resides at 507 W 28th Street,  in the state of New York, in the country of New York and is a citizen of the United States.

7.  Plaintiff is a Caucasian female and has been classified as physically disabled by the Social Security Administration since April 29, 2015.

8.  Defendant is the City of New York, a municipal entity.

9.  The New York City Commission On Human Rights (CCHR) is a legal entity and a subdivision of the City of New York.

10.  SAPNA RAJ and JACQUELINE RIOS are employees of CCHR.

## **JURISDICTION AND VENUE**

11.  Jurisdiction is proper in federal court under federal question jurisdiction.

12.  Venue is proper in the Southern District of New York because the events leading to this action took place in SDNY jurisdiction.

13.  This court has jurisdiction under the state law claims under supplemental jurisdiction.

## STATEMENT OF FACTS

### *Background leading to Plaintiff's interactions with Defendant CCHR*

14. Plaintiff resides in an "affordable unit" in a building subsidized by the New York State 421-a tax abatement program, which promotes mixed income occupancy (apportioned 80% market rate/20% affordable).

15. Plaintiff's lease began on September 25, 2017.

16. Plaintiff's apartment is overseen by Housing Preservation and Development (HPD) and is designated as, not only an "affordable unit", but also specifically a "disability unit"; and, was awarded to Plaintiff in a public lottery on the basis of her disability.

17. Plaintiff's landlord is fully aware of Plaintiff's disability status and the "disability" status of the Plaintiff's specific apartment unit within the building.  The Plaintiff's apartment unit includes wheelchair accessible appliances and shelving as well as additional safety features include grab-bars in the bathroom for mobility assistance and flashing lights on the fire alarm for hearing-impaired persons.

18. Plaintiff's lease, and all leases in the building, contain a "no smoking" clause that classifies the entire building, including the interior of individual units, as "smoke-free."

19. Plaintiff's traumatic brain injury, which is part of her disability, makes her susceptible to migraines and vertigo triggered by exposure to chemical irritants including cigarette smoke and vape fumes.   This makes the "no-smoking" clause of her lease a necessity and not a simple preference.

20. Protection, for chemically sensitive disabled persons, from second-hand smoke and chemical fumes is covered under the Fair Housing Act.

21. Plaintiff's apartment and her relationship with her landlord was an exercise in patience and tolerance (see Further Background below) from day one.

22. But things became truly unacceptable when Plaintiff's realized her chronic migraine's from her traumatic brain injury had become so intractable, since moving into the building, because of powerful formaldehyde fumes that were saturating her apartment every night as she slept.

23. The downstairs neighbor was heating a floor cleaner called Fabuloso and using it to cover the smell of lease-violating cigarette smoke.

24. Plaintiff's pleas to management for relief were scoffed at.

25. Plaintiff was getting sicker and sicker each day.

26. On April 7, 2018, after a week of violently throwing up from the powerful fumes entering her apartment and being too dizzy to stand up, Plaintiff had to call an ambulance to take her to the hospital.   And while the hospital noted her dizziness, it needs to be acknowledged that Plaintiff's condition immediately began to improve upon removal from her apartment's toxic environment.

27. After the hospital visit, Plaintiff  tried again to reminded her landlord of the parameters of her disability, including her head injury, and her need of special accommodations to protect her from migraine triggering chemical fumes… including smoking and vaping… and the incredibly toxic and

dangerous "off-label" use of a floor cleaner her neighbor was using to cover the smell of smoke.

28. It must also be noted that Plaintiff did, in fact, on numerous occasions smell the actual smoke the neighbor was trying to hide with the Fabuloso.

29. Plaintiff then supplied her landlord with the above referenced hospital records, along with a brain MRI report from March 27, 2018, which noted anomalies consistent with physical evidence of the migraines Plaintiff had been complaining about.

30. After being threatened with legal action, Plaintiff's landlord agreed to a mediation process in late-April 2018.

31. The fumes stopped.

32. But chronic wall damaging water leaks continued to plagued Plaintiff's apartment... 21 in five years. (see Further Background below) and the relationship between Plaintiff and management continued to deteriorate.

33. Then the front disability doors began breaking down on a regular basis ... and remaining broken for months at a time.

34. Plaintiff's complaints were met with ridicule and retaliation.

35. After years of escalating confrontations, the treatment of Plaintiff became truly abusive. Management instructed building staff to ignore Plaintiff's complaints and refuse her the respect and services afforded other tenants.

36. Building staff were told to not speak to Plaintiff, but to just refer her to the office on Long Island. At which point, the management team would refuse to answer the phone or return voicemail or email messages.

37. The egregious behavior took a particularly humiliating turn on April 29, 2021, with a confrontation between one of the doormen and the Plaintiff. It concerned the broken disability entrance doors. The doorman mocked the Plaintiff's need to use the doors and refused to open them while leaving her standing outside in the rain.

38. Plaintiff's subsequent complaints against the building and her request that the doorman involved be fired, set off what Plaintiff has perceived to be a concerted effort to harass her out of the building.

39. By June 2021 the fumes entering Plaintiff's apartment had returned as a daily, chronic problem and though, all leases in the building contain "no-smoking" riders, management not only refused to assist Plaintiff in stopping the source of the fumes, but ran interference to protect the violator.

40. Management facilitated the lease violating activity by lying on numerous occasions to both the Plaintiff and her upstairs neighbor, who was also suffering ill effects from the fumes.

41. Management completely ignored Plaintiff's disability needs, and all her requests for "accommodations", to be protected from exposure to the chemicals entering her apartment.

42. This was true even after Plaintiff purchase an air quality monitor to prove what was entering her apartment.

43. Management refused to enforce their own "no-smoking" policy despite being made aware of Plaintiff's level of pain from migraines triggered by the fumes.

44. Thereafter, Plaintiff's landlord refused to fully participate in good faith in any further meaningful negotiations. The circumstances increasingly appeared to be a convenient source of harassment designed to force Plaintiff out of the building.

45. In April 2022, Plaintiff's upstairs neighbor, moved to another apartment in the building to escape the fumes. Her problem, ironically got worse. In April 2023, to protect her children's health, she moved her family out of the building altogether.

### *Facts leading to this action*

46. On March 22, 2022, as Plaintiff's health continued to deteriorate and her physical pain and emotional distress became more and more unbearable, she approached Defendant, the New York City Commission on Human Rights (CCHR), seeking protection and assistance with filing Americans with Disabilities Act (ADA) and Fair Housing Act (FHA) claims against her landlord.

47. The core of Plaintiff's request for protection centered on:

    a.    the toxic fumes entering her apartment

    b.   chronically broken disability doors

    c.   discrimination and abuse by management based on Plaintiff's affordable tenant status

    d.   retaliation due to complaints filed with the Department of Buildings and HPD.

48. A full phone intake session with Defendant, CCHR was scheduled for April 12, 2022 with Defendant, Jacqueline Rios, Agency Attorney, Law Enforcement Bureau (LEB) conducting the interview.

49. On the day of the intake session, Plaintiff emailed Ms. Rios a detailed written breakdown of her history with the building management and a breakdown of her specific complaints, as well as 5 video clips supporting her allegations.

50. Two, of the 5 video clips, provided to CCHR, show the Plaintiff imploring a doorman named Sammy to explain his abusive behavior, only to have him hurls even more deeply offensive insults and abuse at the Plaintiff and deny her services.   This was one of the building staff members who publicly humiliated Plaintiff by mocking her need to use the disability doors.

   a. One of these two videos begins by specifically referencing the issue with the broken disability doors and was recorded because the Plaintiff was forced to come downstairs from her apartment after Sammy, was playing abusive mind games.  He pretended to be a different staff member and then hung up the phone on the Plaintiff while she was attempting to call in a complaint about fumes entering her unit.  It must also be noted that Plaintiff explained to CCHR that management ultimately did have to fire this doorman, but only because of his impersonation of another staff member and that staff member's objections.  Sammy, was not fired for other videos of his abuse of the Plaintiff… apparently because his behavior represented the overall stance of management.

    b. The second video of Sammy shows him overtly saying he refused to do his job specifically for the Plaintiff and again hurls emotionally abusive insults and even mocks Plaintiff's tears of distress.

51. The other 3, of the 5 video clips sent for the intake conference with CCHR, showed the Plaintiff in her apartment with a dangerously low blood oxygen level reading on her oximeter and dangerously high toxic formaldehyde readings on her air quality monitor.

52. Despite the evidence provided to Ms.Rios, Plaintiff's desperate pleas for assistance in filing a formal complaint against her landlord were met with:

    a. unreasonable resistance

    b. misrepresentation of the law, under color of law

    c. and a clear racial bias.

### *Diminished Plaintiff's disability claim compared to racial discrimination claim of another client*

53. Despite Plaintiff's situation causing her extreme physical pain, endangering her health and clearly violating her disability rights, Ms. Rios, compared Plaintiff's claims to another case CCHR had lost in court the prior month (Francis v King Park Manor Inc et al, 2nd U.S. Circuit Court of Appeals, No. 15-17823). The two cases bore little commonality other than they both involved a landlord and the behavior of a neighbor. The Francis case concerned an African American who claimed that his neighbor harassed him on multiple occasions with racist language.

54. Ms. Rios stated, "If we could not win that case for that poor black man, then we won't file a case against your landlord."

55. Ms. Rios added several more statements about how deeply felt her emotional reaction to the Francis case was and simultaneously diminished the importance of Plaintiff's physical pain and suffering.

### *Diminished disability needs compared to drug addiction*

56. Ms. Rios went on to propose hypothetical defenses for Plaintiff's fume producing neighbor by suggesting "they may be trying to get off of something harder".

57. She elaborated enough to make it clear that she was referring to drugs and suggesting that a drug addict's needs would trump any disability protections the Plaintiff was seeking.

### *Misrepresented Disability Law and Denied Protection*

58. Plaintiff cited Poyck v Bryant, et al (2006) as a case more in alignment with her legal objectives. In that case, second-hand smoke fumes were found to be in violation of habitability laws. Plaintiff tried to explain to Ms.Rios that her claimed rights went even further due to her disability needs. But, Ms. Rios remained unmoved and stated the Plaintiff had no viable claims under disability or housing laws.

59. As it became clear that Ms. Rios was putting up too much resistance on the fume issue, Plaintiff attempted to bring in the subject of the chronically

broken disability doors and the doorman's acts of embarrassing and humiliating the Plaintiff's need to use them.

60. Ms. Rios dismissed Plaintiff's complaints out of hand and stated that she was not interested in what she considered expectations of "concierge" service.

61. This was the first of two times Ms. Rios used the word "concierge" in reference to the Plaintiff. And it became clear from her overall attitude that she could have just as easily used the phrase "white privilege."

62. This was even after Plaintiff explained that the doors were of the sliding variety, had no handles and required two hands to pry open when in their broken state. The only other entrance is a revolving door, which Plaintiff's walker can not get through.

63. Ms. Rios, inexplicable claimed that Plaintiff's "expectations" concerning the disability doors were beyond the scope of disability law protections.

### *Misrepresented Plaintiff's protected class status under NYC Civil Rights Code and denied her protection based on her race*

64. When Ms. Rios could not be moved on any subject relating to Plaintiff's disability needs, Plaintiff made an appeal to file a claim of discrimination based on the landlord's differential treatment of her due to her status as an affordable tenant.

65. Plaintiff cited a neighbor two doors down from her on the same floor. This neighbor was a market-rate tenant with a pregnant wife. He threw a few

angry fits about smoke fumes entering his apartment and the building staff made serious efforts to stop the offender.

66. Ms. Rios, responded by telling Plaintiff that she could not claim discrimination based on being an affordable tenant "because that legal status was only meant to protect minorities, because most affordable tenants are minorities."

67. Plaintiff cited the "poor door" case that CCHR brought against another building that, like Plaintiff's building, was an "80/20" mixed income rental. In that case the landlord tried to force the 20% of tenants, who were in affordable apartments, to enter through a separate door.

68. The court found the landlord's actions in the "poor door" case to be discriminatory based on New York City's Civil Rights Code, which recognizes subsidized tenants as a protected class under the umbrella classification of "source of income".

69. Ms. Rios, again pushed back against Plaintiff and falsely insisted that the case was only brought by CCHR because most affordable tenants are minorities.

70. Ms. Rios then stated that since Plaintiff was not claiming to be a minority than Plaintiff was not protected by the law and, because of this, CCHR would not file any complaints for her on that basis.

### *Refusal to file any complaint while demonstrating racial preference for defendant*

71. By the end of the intake conference, the only action Ms. Rios agreed to take was making a courtesy call to Plaintiff's landlord to ask them to voluntarily

assist the Plaintiff, but made it clear that she did not intend to file a formal complaint.

72. Plaintiff made a concerted effort to conceal her anger and frustration because CCHR seemed to be her last hope of getting any help to resolve her problems and find protection for her disability rights.   Plaintiff had already sought assistance from Housing Preservation and Development (HPD), The Mayor's Office for People with Disabilities,  Mayor's Office to Protect Tenants, New York Dept. of Health and Hygiene and even the Environmental Protection Agency (EPA).

73. As a last ditch effort to appeal Ms. Rios' disinterest and misrepresentations of the law, Plaintiff ask to speak to the supervisor whom Ms. Rios claimed was reinforcing the legal interpretations she had presented to Plaintiff.

74. Ms. Rios agreed to have the supervisor call Plaintiff.

75. Ms. Rios then also agreed to look at further evidence Plaintiff wished to share with her via email.

76.  Plaintiff spent the rest of the day on April 12, 2022, forwarding Ms. Rios dozens of emails containing photos, videos, texts and documents to reinforce her claims against her landlord.

77. Ms. Rios did not acknowledge receipt of, or address anything that was sent.

78. Plaintiff began to worry that if Ms. Rios contacted Plaintiff's landlord and conveyed  the weak and legally flawed position she had presented Plaintiff with, it would only encourage the landlord's arrogance and misbehavior.

79. Plaintiff sent several emails and made numerous phone calls attempting to reach Ms. Rios in order to head off her actions until Plaintiff could further confer with Ms. Rios' supervisor.

80. But, Ms. Rios would not respond.

81. Plaintiff finally reached Ms. Rios by phone at 1 pm the following afternoon, April 13, 2022.   At which time Ms. Rios told off the Plaintiff for expecting her to respond and accused Plaintiff of expecting "concierge" service … "which the CCHR does not supply," she added.

82.  Ms. Rios' supervisor, Defendant, Ms. Sapna Raj, finally returned the Plaintiff's call on April 14, 2022, two days after the request was made.

83. Ms. Raj was rude and reiterated the racist interpretation of the law presented by Ms. Rios, stating that Plaintiff could not seek affordable tenant discrimination protection due to her not being a minority.

84. Ms. Raj also completely disregarded Plaintiff's disability claims and dismissed the precedent case (Poyck v Bryant, et al), which Paintiff had asked her and Ms. Rios to look into.

85. Neither Ms. Rios nor Ms. Raj would address any of the evidence sent to them in the many emails following the intake conference.  And Plaintiff's questioning their legal positions appeared to ignited an overtly hostile attitude.

### *Pattern of racially bias behavior and discrimination*

86. Hence, Plaintiff followed up the phone call with Ms. Raj by sending an email putting her on notice that CCHR's failure to act in defending Plaintiff's

disability rights would be considered a pattern of behavior that would be reported to The Department Of Investigations (DOI).

87. Plaintiff notified Defendants that her claim of "a pattern of behavior" was supported by CCHR's prior behavior in another case brought to them by the Plaintiff in 2016. (Kelly MacNeal v New York City Department of Homeless Services, Camba, Project Renewal Inc., et al  M-H-DR-17-11266,  M-H-DR-17-23372,  M-H-DR-17-23377).

88. Plaintiff's disability rights were so egregiously violated while she was in the New York City Homeless Shelter system, that she was beaten and bruised on more than one occasion for simply trying to enforce her disability rights.

89. The maltreatment in the shelter was tainted with a stench of racism, as Plaintiff's medical condition and numerous doctors' notes explaining her need of accommodations (such as access to her bed during the day) were regarded as a sort of "white privilege" by a staff that were entirely made up of black and Hispanic employees.

90. The level of violent animus from the shelter staff was enough to shock the conscience.  Yet, after CCHR filed the initial complaint, they became aware that Plaintiff's evidence revealed an underlying racist nature of much of what had gone on and CCHR chose to close the complaint without issuing any decision.

91. On August 29, 2018, a Notice of Administrative Closure was signed stating, "prosecution of the complaint will not serve the public interest."

92. Evidence suggests that CCHR are, themselves, guilty of anti-Caucasian bias.

93. This is true to such an extreme that CCHR is willing misrepresent the law in order to deny their services and refuse aid to non-minorities, even if that person is disabled and in eminent danger of physical harm or experiencing extreme pain and suffering.

94. After Plaintiff sent Ms. Raj an email on April 14, 2022, expressing her thoughts on making a report to the Department Of Investigations.  Ms. Raj replied with an email claiming CCHR was engaging in what they call "early intervention".

95. What followed was the realization of Plaintiff's worst fears.  CCHR indeed emboldened Plaintiff's landlord.   Without ever consulting with Plaintiff again, for rebuttal or clarification on any detail, CCHR contacted the landlord and offered them guidance on a list of  "accommodations" which CCHR would find acceptable.

96. These suggestions and their rejection was later sited in the CCHR dismissal letter.  The problem was, the list was as inappropriate and as legally flawed as their other legal interpretations.   These suggestions included:


    a.  Taping up Plaintiff's vents ... which was a building code violation.

    b.  Purchasing an air purifier for the Plaintiff ... when Plaintiff already owns a Dyson, which is commonly recognized as THE premium brand of such devices.  This suggestion is also contradicted by the EPA, whose own guidance states that, "secondhand smoke cannot be

controlled by ventilation, air cleaning, or…" .  Plaintiff can definitively

testify to the truth of EPA's statement, based on her own experience.

c.  Changing filters in Plainiff's HVAC and washing machine …. though

neither of these was the source of the fumes.  Nothing inside Plaintiff's

apartment produced the fumes or the fumes would have been present

24 hours a day and never abated.  The fumes had become fairly

chronic, but did wax and wain.

d.  And, the final insult was the suggestion that Plaintiff be constructively

evicted from her apartment and either move to another unit or out of

the building altogether …  This was proposed with a straight face, as

everyone showed horror at the mere suggestion that the neighbor

actually violating the lease and the building rules be threatened with

eviction (if she refused to stop violating the lease)

97. All of these options were presented to Plaintiff through her landlord with the

caveat that they were constructed by CCHR and that if Plaintiff did not accept

them as a solution, then CCHR had assured the landlord that they did all they

were expected to do legally.

98. When the Plaintiff rejected the completely useless and unacceptable

suggestions … for the reasons enumerated above (96 a-d), the landlord

reported this back to CCHR.  And, indeed the landlord has become even more

emboldened and abusive since.

99. No one from CCHR, not Ms. Rios nor Ms. Raj, ever contacted Plaintiff, after the April 14, 2022 email, for any sort of rebuttal or clarification on any information the landlord offered up after CCHR made contact with them.

100.    As a matter of fact, the one and only email Plaintiff ever received from Ms. Rios, was the April 22, 2022 transmission of her official rejection letter. (Exhibit 1)

101.    In the letter Ms. Rios repeats a number of slanderous lies told by Plaintiff's landlord and maliciously warps and twists Plaintiff's position on a number of issues including:

a.   She completely ignores that Plaintiff's claim began with broken disability doors, denials of service and other problems and escalated to a war of retaliation ... the fumes of which are now a central weapon. She doesn't even mention this foundation of the case.

b.   She also conveniently leaves out any mention of Plaintiff's request for protection from discrimination as an affordable tenant and her response concerning race.

c.   She goes on to stress that Plaintiff was uncooperative in negotiations with the landlord for failing to agree to CCHR's useless and unlawful suggestions.

d.   Ms. Rios' views were so warped and biased in her letter, that she went so far as to accuse Plaintiff of harassing the tenant who was harassing the Plaintiff.   She even tries to insinuate that when the Plaintiff placed

a cease and desist letter under neighbor's doors, it was some kind of unacceptably vile act.

e.  Ms. Rios also tries to use against Plaintiff, the fact that Plaintiff confessed to the use of a back vibrator on the floor as a noise deterrent when the fumes became overly strong in the middle of the night.  Ms. Rios conveniently leaves out the fact that this was also implemented by Plaintiff to prove that the downstairs neighbor was the source of the fumes.  It was successful in that a form of communication of answer and response developed:  fumes start … noise starts in reply… fumes stop…. noise stops…. fumes resume… noise resumes…. fumes stop…  on and on and on …  in a war that would last all night, every night.   But the telling aspect of this was, the downstairs neighbor is the only person who could hear the noise.  Thus, if the fumes stopped in reaction to the noise, there is only one possible source. This eliminated all other suspects the landlord kept claiming prevented them from taking action.

f.  Ms. Rios also refers to the harassing neighbor as "elderly" and slanderously implies that Plaintiff  has been harassing an elderly woman.  The fact is, the downstairs tenant is only 14 years older than the Plaintiff, the age of her sister, not her mother.  And even more importantly, the tenant has a daughter, much younger than the Plaintiff, whose has been illegally occupying that subsidized unit which was meant for a disabled person.  The mother spends large

portions of the year out of the country and the daughter seems to be

the main tenant of the apartment.  Which would suggest the

apartment was obtained under false pretenses in the lottery.  For

some unknown reason, the building seemed unconcerned with the

illegal occupancy.  Perhaps, because the daughter has become such a

convenient tool of harassment to retaliate against Plaintiff.

g.  Ms. Rios goes to some length to vilify the Plaintiff's requests for other

tenant's eviction, while ignoring the solid legal basis on which that

expectation is based.   This is while, ironically, she displays no qualms

about suggesting the Plaintiff be forced from her apartment.  At the

very least, the Plaintiff simply wanted building management to

enforce their own lease policy and make it clear to the other tenant

that eviction was a real threat IF, stress added, she refused to abide

the lease provisions including the no smoking clause and the nuisance

clause (which covers the other toxic chemicals, including cleaners and

such, which the tenant  was aerosolizing with heat to mask the smell

of the smoke. Those were fumes that sent Plaintiff to the ER twice in

2018.)

102.    As inappropriate and slanderous as many of the inferences in Ms.

Rios' dismissal letter were, perhaps the most egregious was unstated in any

direct manner and simply achieved through her bias stance.  The Plaintiff's

harassing neighbors are named Idalia and Joselyn Martinez.   Their minority

status seems to have once again influenced the CCHR to apply a racial bias to

their enforcement of the law when suggesting Plaintiff should move and not the minority lease violating harassers.   Plaintiff, gave Ms. Rios the names of those tenants during the intake interview, as Plaintiff questioned whether the tenants themselves should be named in any complaint.

103.     It would appear that CCHR only went through the motions of pretending to "help" Plaintiff because of her threat to report, to the DOI, CCHR's egregiously racist statement when denying Plaintiff the ability to claim "affordable tenant" bias.

104.     But, in actual fact, for the second time, CCHR's racial bias was not the sole problem.

105.     CCHR's racial bias so overwhelmed their reason, that it led to them actively conspiring to deny Plaintiff's disability rights, and condone the behavior of a proposed defendant, by means of intentionally proffering a gross misreading of ADA and FHA law.

106.     The slanted and legally unsound rejection and handling of Plaintiff's 2022 case, on the heels of Plaintiff's 2018 DHS case dismissal, show a pattern of racial bias influencing how the CCHR accept and handle cases.

107.     Because of this Plaintiff began to realize her only route to justice was to, ironically, file a discrimination case against CCHR.

108.     On April 28. 2022, Plaintiff notified CCHR, by email, of her intent to sue, but still left them opportunity to alter course and assist Plaintiff in a meaningful way.

109.     CCHR did not respond to any further emails.

110.     The complete failure of the process left Plaintiff still in agonizing daily

pain.  Merriam-Webster defines the verb form of the word "torture" to mean:

1. to cause intense suffering; to torment,  2. to punish or coerce by inflicting

excruciating pain.  By this definition, Plaintiff continued being tortured every

day and every night in her own home.


### *Retaliation and unlawful imprisonment*

111.     The callousness with which Ms. Rios, Ms. Raj and Plaintiff's landlord

were able to disregard Plaintiff's claims of pain, made it necessary to attempt

to make them understand, through some as yet untried language.  Plaintiff

continued to copy Ms. Rios and Ms. Raj on several emails addressed to her

landlord.  These emails documented her pain and medical progress.

112.     April 29, 2022, an email was sent about a specialized Traumatic Brain

Injury MRI Plaintiff had undergone the day before, as a follow up to another

specialized brain MRI done the previous summer.  This was the 6th brain MRI

since Plaintiff's accident and the 3rd since moving into the toxic environment

of her current apartment...which has substantially increased the level of pain

she has been in on a daily basis.

113.     May 6, 2022, once again, prolonged overnight toxic fumes in Plaintiff's

apartment caused her blood oxygen level to fall to 92%, considered a medical

emergency.   The problem with documenting this in the past, had been, that

by the time Plaintiff would arrive at a hospital, and gone out in fresh air, she

would begin to recover.  For this reason Plaintiff purchased her own blood

oxygen meter and an air quality monitor in an effort to show what was happening to her inside her apartment.

114.    But, despite Plaintiff's best efforts to provide evidence, it had been ignored by both the landlord and CCHR.

115.    Plaintiff became disgusted by all of these people, who were quite literally lacking the humanity to care about a disabled person being tormented by horrible and unnecessary levels of pain, and even deprived safe levels of oxygen in her own home.

116.    For this reason, on May 6, 2022, Plaintiff fired off an angry and sarcastic email, which included a still photo of her 92% oximeter reading and explanatory literature of it's meaning.   (EXHIBIT 2)

117.    In all honesty, Plaintiff hoped her "hail Mary", psychic scream would shake one of the recipients to action and inspire them to help stop the invasive and toxic fumes that were literally poisoning  the Plaintiff.

118.    Unfortunately, the members of Plaintiff's building management, as usual, just completely ignored the email.

119.    But, even more unfortunately, CCHR, chose, not to help resolve Plaintiff's situation, but instead use it as an excuse to terrorize Plaintiff and further slander her reputation.

120.    This can easily be construed as retaliation for Plaintiff's stated intent to bring suit against CCHR.

121.    The language in the email stated that Plaitiff's oxygen was low and her migraine was "EXPLODING IN PAIN…"   She went on to state she was going to

kill herself "if" …. Stress… "if" this doesn't stop.   It was a plea for someone to

come and actually make the fumes stop… not an expression of a wish to die.

It was a plea for any of these people to stop just standing by while Plaintiff

was being physically tortured and in agony.

122.        Given Ms. Raj and Ms. Rios's familiarity with Plaintiff at this point,

they had every reason to know that this email was hyperbolic. Plaintiff had

not ever shown any means or plan to commit suicide, and Ms. Raj and Ms.

Rios should have known that from their extensive interactions with Plaintiff.

123.        Plaintiff went on to make the sarcastic statement, "You are killing me

slowly" (by lack of oxygen)  "… why should I suffer. I should just end it

quickly… I can't stand the pain."   Which should have been properly read as "

You heartless morons, don't you realize that it is a miracle of my will to live,

that I have been able to survive the daily torment I have endured?",  or more

comically,  "If I was less attached to life and perhaps a little smarter, I would

just put myself out of my misery… but neither of those factors apply."

124.        And, again, Ms. Rios and Ms. Raj had every reason to know that these

statements were hyperbolic.  Plaintiff did not enumerate any actual plan or

means of committing suicide.  She was begging for help to end the physical

cause of much of her pain.

125.        It should also be noted that an aid from State Senator Brad Hoylman's

office, who had been trying to help Plaintiff, was also on the recipient list of

that email and found no reason to take it as a serious suicide threat.

126.     If Plaintiff was suicidal, she wouldn't be trying so hard to solve the problem in her apartment.

127.     Defendants' employees should have known, from Plaintiff's perseverance in resolving her apartment issues, that her primary goal was fixing her living conditions, not ending her life

128.     Defendants made no attempt to contact Plaintiff or clarify the meaning of the message in the email.

129.     Instead, on May 6, 2022, CCHR used Plaintiff's email as the basis to make a knowingly false and malicious report to authorities identifying Plaintiff as a "suicide threat."

130.     This, as CCHR were quite aware, did nothing to help resolve any of Plaintiff's problems.

131.     Instead, it brought a terrifying S.W.A.T. team to Plaintiff's front door. And whatever was reported made the responding authorities treat Plaintiff as an armed and dangerous assailant.

132.     Plaintiff even called the attorney representing her personal injury case (for the injuries that made her disabled in the first palce) , and put the police on the phone with him so he could verify that his client was not suicidal.  (Also please note this lawyer was not able to assist Plaintiff with the case against her landlord or this case against CCHR, as he does not practice in these areas of law or in Federal Court).

133.    However, whatever was transmitted from CCHR made Plaintiff sound
so dangerous that the Police and EMT's refused to be dissuaded  from forcing
Plaintiff to be taken for a psychological evaluation.

134.    As soon as Plaintiff gave up trying to reason with the police and
stepped across the threshold of her front door, she was violently handcuffed
and humiliatingly strapped into a chair and dragged out of the building in
front of her neighbors.

135.    This humiliation fed the adversarial relationship Plaintiff has with her
building and the abusive superintendent used the spectacle to tell other
tenants that Plaintiff had been arrested and that she was mentally ill.

136.    To this day there are people in the building that actually believe these
lies and are afraid to get in the elevator with Plaintiff, or they treat her in an
unfriendly manner.

137.    Meanwhile, the reality was that, after Plaintiff's totally unnecessary
psychological evaluation, she was not admitted to the hospital because she
was clearly not suicidal or a danger to herself or others.  But, again, because
of whatever was reported, Plaintiff was still forced to spend the night in the
observation area of the hospital.

138.    The fact that the hospital wouldn't let Plaintiff go immediately, even
after it was obvious that she was not suicidal, was false imprisonment, which
appears to be directly linked to statements made by CCHR.

139.     Plaintiff is still bearing the psychological trauma of being physically assaulted and then falsely imprisoned as a direct result of asking for help to stop the daily abuse she was enduring in her apartment.

140.     The injustice and irony are beyond painful.

141.     And due to the delay in obtaining any help, Plaintiff's health has continued to deteriorate, both mentally and physically.

142.     Plaintiff's most recent blood tests come back with abnormalities associated with either  cancer or an auto-immune disease.  Plaintiff had to undergo an MRI of her adrenal glands and a sonogram of her thyroid. Answers are still alluding the doctor.

### *Further Background of Fair Housing Complaint for which Plaintiff Requested Assistance from CCHR*
(These issues are only background, to establish validity of
case brought to CCHR and are NOT the primary causes of action in this case)

143.     On October 2, 2017, five days after Plaintiff's picked up the keys for her new apartment (her current address), a massive upstairs flood caused substantial damage to Ms. MacNeal's apartment.  It was the first of three separate water damage incidents to occur in the first two weeks of her tenancy and the first of 21 such incidents to occur in five years leading up to the date of this complaint.  The building is only six years old.

144.     The Superintendent refused to clean up the construction dust that covered the entire apartment after the repairs were done.  This was despite knowing that the Plaintiff was disabled by a broken back and had not even fully moved into the apartment yet.

145.    Plaintiff was coming out of the shelter system and awaiting Human Resources Administration to arrange movers to bring her belongings from storage and so was forced to purchase a broom, mop, bucket and all manner of cleaning supplies to make the apartment livable.

146.    The clean up caused Plaintiff extreme pain from having to exert her injured back.

147.    The ultra-fine dust blanketing the apartment, from sanding large swaths of drywall putty, caused Plaintiff to get a cyst in her right eye; which remained until 2023 when her Ophthalmologist had to surgically remove it. Plaintiff, is legally blind in her left eye and so this jeopardized the one good eye she has.

148.    When the chronic leaking, caused by the Superintendent's unskilled plumbing and the owner's poor building construction, was reported, by the Plaintiff, to the Department Of Buildings (DOB) on April 27, 2018, the owner was served an A8 OATH Violation – "failure to maintain the building in code compliant manner, …".

149.    Instead of apologizing for what Plaintiff had been contending with, the management/owner's entrenched themselves into an unacceptably acrimonious and adversarial relationship with the Plaintiff.

150.    This escalated into a non-stop string of harassments, which interfered with Plaintiff's life, health and peace of mind. This included:

    a.    Refusing to return the original signed leased for almost a year, until their refusal was reported to HPD.

b.  Mailing the renewal late, without a postmark and backdating the cover letter to make it look like it was mailed timely.

c.  Inserting language in the first renewal lease, which would allow the owner to illegally retract the affordable rent.  That language was forced to be removed after Plaintiff reported it to HPD.

d.  As Plaintiff made the numerous reports of owner's violations to appropriate authorities, she began being inundated by toxic fumes from the tenant in the apartment beneath her.   The fumes were a mix of smoke, vape and toxic cleaning fluids inappropriately aerosolized by heating to cover the sent of the smoke.*  The daily fumes were so toxic Plaintiff became to dizzy to stand and on two occasions felt the need to go to the emergency room.

e.  After a round of mediation between Plaintiff and her landlord, the fumes stopped.

f.  But the leaks continued.

g.   And then the front disability doors began breaking down on a regular basis.

h.  Plaintiff's complaints were met with retaliation and ridicule.

i.  Then the fumes entering Plaintiff's apartment returned.

j.  A concerted campaign of harassment against the Plaintiff ramped up, and the circumstances appeared to be a very convenient source of harassment designed to force Plaintiff out of the building.

k.  Plaintiff's failure to find relief elsewhere, led to her approaching

CCHR.

*heating such cleaning liquids as floor cleaner and fabric softener on the stove or in a vaporizer is a dangerous trend shared on social media and demonstrated on video sharing platforms. It release substantial and toxic levels dangerous chemicals into the air.

## CAUSES OF ACTION

151.    Plaintiff, brings this action against the City of New York for its

municipal liability in 2(i-iii) under 42 U.S.C. § 1981, 1983 for discrimination

on the basis of race, in violation of the Fourteenth Amendment of the U. S.

Constitution.

152.    Plaintiff, brings this action against the City of New York for its

municipal liability in 2(i-iii) under 42 U.S.C. § 1985(3), for multiple agents

misrepresenting the law, in concert, and by which mode, did conspire to

deny, and did deny, Plaintiff equal protection under the New York City Admin

Code Title 8 Civil Rights et seq. and New York Consolidated Laws. Civil Rights

Law – CVR § 1 et seq , based on her race in violation of the Fourteenth

Amendment of the U. S. Constitution.

153.    Plaintiff, brings this action against the City of New York for its

municipal liability in 2(i-iii), under 42 U.S.C. § 1981,1983, 1985(3), 1986 for

multiple agents misrepresenting the law, in concert, and by which mode, did

conspire to deny, and did deny, Plaintiff equal protection under the law with

regard to her rights under the Americans with Disabilities Act (ADA) and the

Fair Housing Act (FHA) and did show negligence to prevent her abuse and

harm due to such lack of protection by these laws and 42 U.S.C. Chapter126. This is particularly egregious as, protecting citizen's civil rights, is the stated purpose of the existence of CCHR.

154.    Plaintiff, brings this action against the City of New York for its municipal liability in 2(i-v), under 42 U.S.C. § 1983, 1988 and New York common law for unlawful imprisonment in violation of the Fourteenth Amendment of the U. S. Constitution and New York common law.

155.    Plaintiff, brings this action against the City of New York for its municipal liability in 2(iv-v), under 42 U.S.C. § 1983 and 42 U.S.C. Chapter126 for violating her rights under the Americans with Disabilities Act (ADA). For failure to properly assess Plaintiff, and take due care, before forcibly taking her from her home and violating her due process in violation of the Fourteenth Amendment of the U. S. Constitution. Plaintiff also claims excessive force was used in this action.

156.    Plaintiff, brings this action against the City of New York for its municipal liability in 2(i-v), under 42 U.S.C. § 1983, 1988 and/or New York common law for intentional and negligent infliction of emotional distress.

157.    Plaintiff, brings this action against the City of New York for its municipal liability in 2(i-v), under 42 U.S.C. § 1983, 1988 and/or New York common law for defamation, with damage to reputation and causing extreme embarrassment.

158.    Plaintiff, brings this action against the City of New York for its municipal liability in 2(i-v), under 42 U.S.C. § 1983, 1988 and/or New York

common law for retaliation, carried out with malice, for the intended

purpose of intimidating Plaintiff and damaging her credibility with regard to

this law suit.

159.    Plaintiff, brings this action against the City of New York for its

municipal liability  under 42 U.S.C. § 1983, 1988 and/or New York common

law for negligent supervision and lack of appropriate training of: a) the

representatives of the City Commission on Human Rights, b)Police officers

and c)EMS responders.

## JURY DEMAND

160.    Plaintiff demand a trial by jury on all questions of fact raised by this

complaint.

## RELIEF

161.    Plaintiff seeks compensatory and punitive damages for the physical

pain and suffering she has endured for the past year and a half.  The

debilitating, life destroying, migraines that have stolen all peace and

happiness from Plaintiff, have been unnecessarily triggered and/or

intensified by circumstances that should have been brought to an end, had

the City Of New York and CCHR taken care to uphold their responsibilities in

implementing and enforcing ADA and FHA laws.

162.    Plaintiff seeks punitive and compensatory damages for the infliction

of extreme emotional distress associated with the callous racism and

disregard of her disabilities suffered at the hands of CCHR.

163.     Plaintiff seeks punitive and compensatory damages for the infliction of fear and terror when she was forcible taken from her and held against her will for an unnecessary psychological evaluation.

164.     Plaintiff seeks punitive and compensatory damages for the loss of reputation and public humiliation caused , when she was dragged from her home in handcuffs. This action, was completely unnecessary since, once it became clear that the Police would not be convinced that Plaintiff was in no way suicidal, and Plaintiff was going to be forced to go one way or another, Plaintiff agreed to cooperate.  But. The violence with which she was then treated served only to intentionally humiliate the Plaintiff.  The Police grabbed her walking cane from her,  threw her into the wall and incorrectly placed handcuffs on sideways cutting into her wrist bone.  The police then, without regard for Plaintiff's disabled back injuries, which Plaintiff warned them about, shoved her into an unstable portable chair/frame and strapped her in forcing her into a position that caused not only her back injury to spasm, but she was then leaning on her wrists where the sideways cuffs were digging deeper into her bone..  As she screamed in pain she was made to look completely insane.  This scene later became fodder for Plaintiff's adversarial relationship with the Superintendent, who happy spread the rumor that I wa mental ill and had been arrested..  Dozens of people in the building saw me being taken away and are still weary of me in the hallways.  The incident constituted excessive force and has left me with some degree of post traumatic stress.

165.     Plaintiff seeks punitive and compensatory damages for the act of

retaliation that prompted the call to the police by CCHR.  It was vindictive

and in no reasonable way could be construed as an attempt to offer any kind

of aid or assistance that the Plaintiff was in dire need of.  As a matter of fact,

the sheer horror that all of the actions stemmed from Plaintiff asking help

and instead being further abused has left Plaintiff with deep emotional scars.

166.     Plaintiff seeks punitive and compensatory damages for the fact that

both the racial bias and the disregard for Plaintiff's disability needs have

been a pattern of behavior displayed, not only within the CCHR, but was also

such a problem with in the New York City shelter system while Plaintiff was

there.  It is a cultural problem and clearly due to systemic negligent

supervision from the top of this municipality through all of it's agencies.

167.     Plaintiff seek any other relief that this Court deems just and proper.



Dated: New York, New York
        March 15,2024

                                    Respectfully Submitted,

                                    Kelly MacNeal
                                    Plaintiff
                                    507 W 28th St
                                    New York, NY 10001

# Exhibit 1



# Reply and filing deadline

1 message

**Mac Mac** <████████████@gmail.com>                                    Thu, Apr 21, 2022 at 12:44 PM
To: ████████████@cchr.nyc.gov>, ████████.nyc.gov
Bcc: ████████████@gmail.com

I also received no reply about the pictures I sent of the front doors.  Did they give you a better
understanding of why I was not "expecting concierge service" to need help opening them?  Keep in mind
my complaint about the doors is what has brought on the current level of harassment as retaliation.
You have one week to file my complaint. The deadline is April 28, 2022.

Kelly MacNeal
████████████

Sent from my iPhone



# No progress

1 message

**Mac Mac** ▓▓▓▓▓▓▓▓@gmail.com>                                        Thu, Apr 21, 2022 at 6:23 PM
To: Sapna Raj ▓▓▓▓cchr.nyc.gov>, ▓▓▓▓cchr.nyc.gov
Bcc: ▓▓▓▓▓▓▓▓gmail.com

After several more days of back and forth emails, my landlord is sticking by the lie that they do not
know who the smoker is.  This is an absolute lie.
The problem is they have lied themselves into a corner and are unwilling to admit that they have been
lying and playing games for nine months.

They still won't even acknowledge the second victim of the fumes in the apartment above me.

I see no end to this problem though intervention.

Please let me know how you intend to proceed.

Thank you,
Kelly MacNeal
▓▓▓▓▓▓▓


Sent from my iPhone

# Please respond

1 message

**Mac Mac** <████████@gmail.com>                    Fri, Apr 22, 2022 at 4:16 PM
To: Sapna Raj <███████████████████████████
████████████████████

I have not received any response from this office to follow up on what is a failed intervention.

The fumes are still coming into my apartment and of the three so called  offers of "accommodation", two were completely useless.

1.  I already have a Dyson air purifier.

2.  Changing my HVAC filters has nothing to do with where the fumes are coming from.  As for the washer and dryer... there had been a mold smell coming from all the units in the building, but that was fixed years ago and the current smoke and vape fumes have NOTHING to do with that.  My washer is fine and the smell is not coming from there.

3.  And moving me is not an option.  I have a broken back and packing and moving is too traumatic for me.

The source of the fumes must be located and the building has to stop refusing to offer me the same service in doing that which they offer other tenants.


This is why I need to file the broader discrimination complaint.
Why are you not following up with me?

Kelly MacNeal
████████████


Sent from my iPhone


# Kelly MacNeal, CCHR Investigation No. M-H-D-22-107712

4 messages

---

**Rios, Jacqueline (CCHR)** ████@cchr.nyc.gov>                Fri, Apr 22, 2022 at 5:42 PM
To: Mac Mac████████████@gmail.com>

Dear Ms. MacNeal:

We write to inform you that the New York City Commission on Human Rights, Law Enforcement Bureau ("LEB"), will not be proceeding with a complaint in this matter.

On April 12, 2022, LEB conducted an intake with you regarding allegations that your landlord and the management company of the building you reside in ("Respondents") are failing to provide you with reasonable accommodations and discriminating against you based on your disability. You alleged that persistent fumes from smoking and/or vaping are entering your apartment and exacerbating your disabilities. You explained that you want Respondents, as part of your reasonable accommodation request, to enforce the building's no-smoking policy by evicting the tenant that you believe is the source of the fumes entering your apartment. During the intake, LEB's jurisdiction and the issues LEB would be able to address regarding your complaints involving your housing provider were explained to you -- specifically, that LEB would not demand eviction of another tenant as part of a reasonable accommodation. On April 12, 2022, you agreed to LEB's early intervention process to address your concerns.

LEB contacted Respondents who provided evidence of a cooperative dialogue, steps they have taken thus far, and proposed the following accommodations: 1) placing you on a waitlist for a different accessible apartment so you may transfer as soon as another unit is available; 2) accessing your apartment to change the HVAC filters and check washer drains; and 3) offering to purchase an air purifier for your use. In your response you refused these proposed accommodations. You have indicated clearly that you are not willing to accept any of the proposed accommodations.

LEB has also received information about complaints from neighbors who feel unfairly targeted and harassed by your accusations of smoking, especially the elderly neighbor you believe is smoking. LEB has also reviewed emails where you describe your personal efforts to "dissuade her behavior" by putting your "back massager on the floor to rattle her nerves," slipping cease and desist notes under their door, etc.

The matter with LEB is now closed.

**Jacqueline E. Rios**

Agency Attorney, Law Enforcement Bureau

New York City Commission on Human Rights

22 Reade Street | New York, NY 10007

T: (212) 416-0148 | C: (347) 988-5149

F: (646) 500-6320 | NYC.gov/HumanRights

Pronouns: she/her/hers

---

**Mac Mac** <████████@gmail.com>                    Fri, Apr 22, 2022 at 7:59 PM
To: Rios, Jacqueline (CCHR) <████cchr.nyc.gov>, Sapna Raj <███@cchr.nyc.gov>
Bcc: ████████gmail.com

How do you claim I refused to cooperate.

1. I ALREADY OWN an air purifier!!!!!!

2. I told them to go ahead and change my filters ... but it has nothing to do with the smoke!

3. You are telling me if I won't be moved, than I am just to endure the fumes. My disability makes moving TRAUMATIC!!!!!! I can not move.

How is this not cooperating?

As far as the back massage on the floor. I AM THE ONE that told my landlord about that .... not the tenant under me.

It was an experiment which proved that she was the smoker. I was daring her to call downstairs and complain and have someone come to her apartment. Of course, she never did because they would have smelled the smoke. That was why I only did it when she smoked. I wanted someone to go to her apartment. And while she never would call in the complaint, It did act as a deterrent and she would react to it. It would often make her switch from the stinky cigaretellos to a quick puff of cherry vape to cover the smell. I only told the management about what I did to offer further proof of her reacting to me and to demonstrate that it was in fact her creating the fumes

But of course, because they are promoting this behavior to harass me out of the building, the management only entered a complaint about the noise in the computer system after I told them about it. The tenant never complained herself because she wouldn't have chanced them coming to her apartment.

And there are not multiple neighbors complaining about my smoke accusations. That's another lie. I have always known it was coming from below. The building made me ask many other neighbors myself after they lied and said they had contacted.my neighbors. All of my other neighbors have been kind and sympathetic. They also confirmed that management lied about contacting them... management never spoke to anyone or investigated.

And this attitude that my accusation are made up is really offensive coming from you, considering I already offered you the proof that the tenant above me was also experiencing the fumes. I also

demonstrated how the landlord was lying to both her and I about the fact that there were more than one person having a problem.

So thank you for letting my landlord continue to sicken me and completely violate my disability needs. You're doing a bang up job of protecting people's civil rights.

BTW, the "elderly" lady below me ... smoking me out ... is only 14 years older than I am. And I never insisted they evict her. They just need to make her stop smoking. If she won't, then being evicted is the punishment. She has an option. Unfortunately, I don't! Who is protecting me?????

I will be forwarding this to the Department of Investigations.

Kelly MacNeal
███████████

Sent from my iPhone
[Quoted text hidden]

---

**Mac Mac** ███████████gmail.com>                    Fri, Apr 22, 2022 at 9:02 PM
To: Rios, Jacqueline (CCHR) ████@cchr.nyc.gov>, Sapna Raj ███@cchr.nyc.gov>
Bcc:███████████████

And the fact that I am being caused such extreme pain with the aggravation of my migraine...

And the fact that I am being made sick ALL DAY EVERY DAY...

And the fact that I am developing pulmonary problems even though I am a non-smoker...

But you don't think my rights are being violated??

And I find it incredibly unprofessional and bias that you seem to have spent plenty of time listening to the landlord's lies and misrepresentations without ever bother to come back for a rebuttal from me.

You also never even bothered to acknowledged the receipt of the additional documentation I sent you, including photos of the front doors, the new letter from my doctor and the referral to a pulmonary specialist.

How do you claim you were a neutral party. You never communicated with me in any manner after I filed my complaint. You dealt solely with the landlord and then dismissed my complaint based on their unchallenged lies. And to add insult to injury you have the indecency to insinuate that I am harassing the person harassing me.

I will be crying myself to sleep again tonight as the toxic air in my apartment assaults me .... because that is your idea of Justice.

Here is another text from my neighbor upstairs:


<   **Qi - Neighbor**   

Tuesday 2:17 AM

She's really puffing away on the flavorless vape tonight.:(



Went to doctor today. She detected a wheeze in my breathing that was never there before.

Today 8:08 PM

Are getting fumes?

Not yet. But yesterday was lots of fumes

Yes

 | Text Message | 

My landlord is a liar!

It's a good thing they have people like you to protect them.

Kelly MacNeal

Sent from my iPhone

On Apr 22, 2022, at 5:42 PM, Rios, Jacqueline (CCHR) ████████cchr.nyc.gov> wrote:

[Quoted text hidden]

---

**Mac Mac** ██████████gmail.com>                    Fri, Apr 22, 2022 at 10:18 PM
To: Rios, Jacqueline (CCHR)██████cchr.nyc.gov>, Sapna Raj <████cchr.nyc.gov>
Bcc: ████████████████

And to further demonstrate your complete ignorance, here is what the EPA has to say about your suggestions that my air purifier or changing my filters in my HVAC could, in anyway, address secondhand smoke. (See photo)

# How Does Secondhand Smoke Enter An Apartment?

Secondhand smoke can come into your apartment in multiple ways. Secondhand smoke does not respect boundaries, seeping through light fixtures, wall electric outlets, ceiling crawl spaces, and doorways into all areas of a building with smokers. Secondhand smoke cannot be controlled by ventilation, air cleaning, or the separation of smokers from nonsmokers. The U.S. Surgeon General has determined that there is no safe level of exposure to secondhand smoke and that eliminating smoking in indoor spaces is the only way to fully protect nonsmokers from secondhand smoke exposure.

Read more about Secondhand Smoke.

# Related Questions

- Who has the authority to ban or limit exposure to environmental tobacco smoke?

Your suggestions did not even begin to qualify as "accommodations" to eliminate the secondhand smoke affecting my disability.

So, moving was the only option you were giving me.  An option that, in Itself, is not possible because of my physical limitations and the trauma it would cause me ... physically and mentally.  I was already evicted because I became disabled and couldn't pay my rent.  I spent TWO YEARS in the shelter system being beaten and abused for needing access to my bed  during the day to ease my back spasms.  And now you are going to evict me from this apartment because my disability is making it impossible to stay here!!!!  And that's just the mental trauma.  I can not go through the packing and moving process again with my chronic pain and physical limitations.  What makes you think I should be forced to endure that trauma?

Why did you not remove yourself from my case and let someone else handle it?  You CLEARLY showed a bias against me from the beginning with your obnoxious "concierge" reference.  You CLEARLY have no compassion or understanding of the challenges of people with disabilities.

And during my intake interview you actually dismissed my concerns about vape fumes by saying "it could be someone trying to quit something stronger".  As if to say, that someone trying to kick some addiction has the right to poison me with their formaldehyde laden fumes and I should just shut up and take it... even if I live in a no-smoking building.   You apparently think a drug addict's rights are more protected than my disability rights.

You had absolutely no business handling my complaint with your level of ignorance and bias.

I will be filing formal complaints.

Kelly MacNeal



Sent from my iPhone

On Apr 22, 2022, at 5:42 PM, Rios, Jacqueline (CCHR) ██████@cchr.nyc.gov> wrote:

[Quoted text hidden]



# Missing the point

1 message

**Mac Mac** <███████████@gmail.com>                           Sat, Apr 23, 2022 at 12:37 AM
To: Sapna Raj <█████cchr.nyc.gov>, █████@cchr.nyc.gov
Bcc: ██████████████mail.com

And I don't know how this point was lost on you, but my complaint was about the disability doors and the ensuing retaliation and escalation of harassment because I stood up for my rights and complained about the chronically broken doors and the doorman mocking me.  The smoking situation became part of the retaliation that grew out of that.  They were compounding one disregard for my disability needs on top of another.

I was being more than generous by agreeing to drop the whole complaint if they simply stopped the smoking and harassment   But since they are not willing to do that, I have a right to continue my full complaint.

Why are you sanctifying their harassment of me and kicking me to the curb with no means to protect myself?

Kelly MacNeal

Sent from my iPhone

# ProtectedClasses_Factsheet

2 messages

---

**Mac Mac** ██████████gmail.com>                                    Sat, Apr 23, 2022 at 1:49 AM
To██aj@cchr.nyc.gov, ███@cchr.nyc.gov
Bcc: ██████████████████

And why have you been telling me that my status as an affordable tenant isn't protected.  The attached document clearly states that tenants with subsidies are protected.

My building is 421-a (80/20) housing.  20% of the tenants, including me, are subsidized.   It is illegal for the landlord to deny services or treat the subsidized tenants in a discriminatory manner.

I have already told you they went to great lengths to find a smoker that was disturbing my non-subsidized neighbor in 26A.

My maltreatment has a great deal to do with my subsidized status.

Why don't you seem to understand any aspect of my case?


Kelly MacNeal

Sent from my iPhone

---

**Mac Mac** ██████████████████                                    Wed, Apr 27, 2022 at 3:29 PM
To: ████@cchr.nyc.gov,███@cchr.nyc.gov
Bcc: ██████████████████

I need a response to the email below ... and the others I sent last Friday.
Your claimed "intervention" did nothing to help me.  I have legitimate complaints.  Yet, you are denying me proper assistance to defend my rights.

Kelly MacNeal
████████████

Sent from my iPhone


> On Apr 23, 2022, at 1:49 AM, Mac Mac██████████████████mail.com> wrote:
>
> And why have you been telling me that my status as an affordable tenant isn't protected.  The attached document clearly states that tenants with subsidies are protected.
>
> My building is 421-a (80/20) housing.  20% of the tenants, including me, are subsidized.   It is illegal for the landlord to deny services or treat the subsidized tenants in a discriminatory manner.
>

> I have already told you they went to great lengths to find a smoker that was disturbing my non-subsidized neighbor in 26A.
>
> My maltreatment has a great deal to do with my subsidized status.
>
> Why don't you seem to understand any aspect of my case?
>
> <ProtectedClasses_Factsheet.pdf>
[Quoted text hidden]

# NYC
## HUMAN RIGHTS

If you wish to file a complaint with the Commission on Human Rights, you must do so within one year of the last alleged act of discrimination. The Commission's services are provided free of charge. To schedule an appointment, please call or **212-416-0197**.

If you wish to file a complaint in State Court, you must do so within three years after the last alleged act of discrimination. You may not file both with the Commission and in State Court.

To request a training, or to learn more about the Commission's work, visit **NYC.gov/HumanRights**.



## EMPLOYMENT

It is illegal to discriminate against employees, interns, job seekers, and independent contractors on the basis of:

Age • Arrest or Conviction Record • Caregiver Status • Color • Credit History • Disability • Gender • Gender Identity • Immigration Status • Marital or Partnership Status • Military Service • National Origin • Pregnancy • Race • Religion/Creed • Salary History • Sexual and Reproductive Health Decisions • Sexual Orientation • Status as Victim of Domestic Violence, Sexual Violence, or Stalking • Unemployment Status

## HOUSING

It is illegal to discriminate against tenants, apartment seekers, and home buyers on the basis of:

Age • Color • Disability • Gender • Gender Identity • Immigration Status • Lawful Occupation • Lawful Source of Income (including housing subsidies) • Marital or Partnership Status • Military Service • National Origin • Pregnancy • Presence of Children • Race • Religion/Creed • Sexual Orientation • Status as Victim of Domestic Violence, Sexual Violence, or Stalking

## PUBLIC ACCOMMODATIONS

It is illegal to discriminate in public spaces like stores, restaurants, parks, libraries, or taxis on the basis of:

Age • Color • Disability • Gender • Gender Identity • Immigration Status • Marital or Partnership Status • Military Service • National Origin • Pregnancy • Race • Religion/Creed • Sexual Orientation

## DISCRIMINATORY HARASSMENT

It is illegal to physically threaten or use force against someone or to damage property because of:

Age • Color • Disability • Gender • Gender Identity • Immigration Status • Marital or Partnership Status • National Origin • Pregnancy • Presence of Children • Race • Religion/Creed • Sexual Orientation

## BIAS-BASED PROFILING BY LAW ENFORCEMENT

It is illegal for law enforcement to target someone because of:

Age • Color • Disability • Gender • Gender Identity • Housing Status • Immigration Status • National Origin • Pregnancy • Race • Religion/Creed • Sexual Orientation

## LENDING PRACTICES

It is illegal to discriminate in lending practices or terms because of:

Age • Color • Disability • Gender • Gender Identity • Immigration Status • Marital or Partnership Status • Military Service • National Origin • Pregnancy • Presence of Children • Race • Religion/Creed • Sexual Orientation

## RETALIATION

The law prohibits retaliation for opposing a discriminatory practice, filing a complaint of discrimination, assisting in an investigation of discrimination, or testifying in a proceeding related to a discrimination case.



---

## Your illegal suggestion

1 message

---

**Mac Mac** <████████gmail.com>　　　　　　　　　　　　　　　Thu, Apr 28, 2022 at 1:11 AM
To: Armina Thomas ████@lalezarian.com>, Sapna Raj <███@cchr.nyc.gov>
Bcc:████████mail.com

Armina,
I also want to remind you that bathroom ventilation is REQUIRED by the building codes.

I live in a glass box with only one window that open only a few inches in my living room and likewise in my bedroom. Defying the ventilation requirements in the building code by blocking off my bathroom vent is not, in any way, an appropriate "disability accommodation".

I am not refusing to cooperate. You are trying to force me to accept your illegal suggestion.

And, as I showed you in pictures, I already own a Dyson HEPA filter air purifier. It has not protected me from these fumes assaulting me on their way to the machine. And the CONSTANT stream of stench never gives my machine the ability to rid the air of the contaminants. Here is my Dyson pictured sucking in the fumes from the the bedroom, where they are worst and, not only filtering the air, but sending it straight out the window. And the second picture is my regular fan blowing INTO the bathroom vent in an effort to keep the fumes from entering. And I still can't be rid of the fumes.





Even if you updated my Dyson to this Formaldehyde scrubbing version, it would not fix the problem.  So you can save your money and just stop the problem at its source.
https://www.dyson.com/air-treatment/air-purifiers/purifier-cool-formaldehyde-tp09

And your third option of making me move would only cause more pain and destress and violate all of my other disability needs.  I can not go through the physical demands of a move or suffer the emotional destress of a forced eviction.

Kelly MacNeal

Sent from my iPhone

On Apr 27, 2022, at 10:14 PM, Mac Mac <█████████gmail.com> wrote:

Here is another ruling on your responsibility and the subject of habitability with regard to secondhand smoke ( This and the other information sent don't address your responsibility to my need for a disability accommodation-of which would make adhering to these rulings even easier for a judge) :

The Civil Court of the City of New York ... ruling that "in the context of implied habitability, secondhand smoke is just as insidious and invasive as the more common conditions such as noxious odors, smoke odors, chemical fumes, excessive noise and water leaks and extreme dust penetration."

Sent from my iPhone

> On Apr 27, 2022, at 9:48 PM, Mac Mac <██████████@gmail.com> wrote:

Please find attached information from NYC smoke-free housing website:

<Screenshot_20220427-214422_Drive.jpg>

Exhibit 2



# Claim filing deadline

2 messages

---

**Mac Mac** ████████@gmail.com>                                      Thu, Apr 28, 2022 at 1:18 AM
To: Sapna Raj ████@cchr.nyc.gov>
Bcc:████████@gmail.com

Ms. Raj,
I just want to put you on notice that if a claim is not timely filed on my behalf before 4/28/22, I intend to file a notice with the Comptroler's Office of intent to sue your agency for discrimination.

Kelly MacNeal

Sent from my iPhone

---

**Mac Mac** ████████@gmail.com>                                      Thu, Apr 28, 2022 at 12:16 PM
To: Sapna Ra████████cchr.nyc.gov>
████████████████████

Correction to last email:

If the case is not filed **by** 4/28/22.... not **before** 4/28/22.

I notified you that the start date of the current harassment was 4/29/21... I assume the one year cut off for filing is 4/28/22.

Not only have you denied me proper defense of my disability rights, by belittling them in comparison to a completely irrelevant case about an African-American man suing his landlord over a racist neighbor.

But, you have wrongly stated that my subsidized tenant status is NOT a protected class. Ms. Rios, claimed that the famous "poor door" victory, previously won by the CCHR, was only based on race and meant to protect minorities.

You are denying me proper protections as both a disabled and subsidized tenant based on the fact that I am not a minority.

I intend to charge the CCHR with racial discrimination.

Kelly MacNeal
████████

Sent from my iPhone
[Quoted text hidden]



# Dying on ██████████

1 message

**Mac Mac** ██████████mail.com>                                    Fri, Apr 29, 2022 at 2:01 PM
To:████████████████████████████████@lalezarian.com>
Bcc:███████nysenate.gov, █████cchr.nyc.gov,█████cchr.nyc.gov, ████████████@gmail.com

Armina and Arine,
And today██████████ I have spent the morning crying.  I am short of breath after another night of toxic air ruining my ability to sleep or live in peace in my apartment.  My head is POUNDING and I'm having chest pains.  I feel like I'm dying!!!!!!  These fumes are destroying my life.

Yesterday I had a whole new set of specialized Traumatic Brain Injury MRIs, to find out more about my chronic migraine.  This is in addition to another specialized MRI done last summer and the 4 other brain MRI's I have had to undergo since my accident in 2014.... all of which you have been informed of.

You are, not only unbelievable heartless to keep tormenting me like this, but you are breaking disability law!


Kelly MacNeal
██████

Sent from my iPhone

*Alpha*
**3T MRI**
*& Diagnostic Imaging*
Managed by NYMR Solutions

Traumatic Brain Injury Assessment
Diffusion Tensor Imaging
MRI Spectroscopy
Susceptibility Weighted Imaging
NeuroQuant Morphometry
High Resolution Musculoskeletal MRI

**145 EAST 32ND STREET**
**NEW YORK, NEW YORK 10016**
P:212-868-9210 F:212-868-9213
INFO@NYMRI.COM
WWW.NYMRI.COM

Last Name: _MacNeal_   First Name: _Kelly_

Phone: (h): _____ (w): _____   Cell: _____

Sex: ☐M ☐F   Date of Birth: _____   Email: _____

Referring Clinician: _____   Phone: _____

Referring Clinician Address: RAN_____ KRISHNA M.D
_____ AVENUE
BROOKLYN, NY 11239
718-332-7870

**Referring Clinician's Signature:** _____

**Clinical History:**

Do you want to schedule a demonstration to view your pat____
If so, would you prefer a remote demonstration, or would yo____

Referring Clinician's email: _____

*DTI*

**DIAGNOSTIC MRI EXAMS**

Gadolinium Contrast Injection: ☐Yes ☐__

**Comprehensive TBI Exam**
☐ CHECK HERE FOR ALL COMPREHENSIVE TBI EXAMS!
☐ Trauma Brain (SWI, ADNI, 3D T2/FLAIR)
☐ Spectroscopy (2D-CSI white matter)
☐ NeuroQuant (serial studies suggested)
☐ Diffusion Tensor Imaging (DTI): ROI technique
☐ MRV (c/o tbi-related deep venous sinus stenosis)
☐ (if 212-868-9210 if advanced DTI is requested)
☐ Whole Brain FA Histography, Voxelwise Analysis

| | |
|---|---|
| ☐ Routine Brain | |
| ☐ ENT | |
| ☐ TMJs | |
| ☐ MRA Neck | |
| ☐ MRA Brain | |
| ☐ MRV Brain | |
| ☐ Cervical Spine | |
| ☐ Thoracic Spine | |
| ☐ Lumbosacral Spine | |
| ☐ Sacrum Coccyx | |

☐ _____   ☐ L ☐ R
☐ _____   ☐ L ☐ R
☐ Upp__ ___   ☐ L ☐ R
☐ Elbow   ☐ L ☐ R
☐ Wrist   ☐ L ☐ R
☐ H___   ☐ L ☐ R
☐ Thi___   ☐ L ☐ R
☐ Knee   ☐ L ☐ R
☐ Lower Leg   ☐ L ☐ R
☐ Ankle   ☐ L ☐ R
☐ Foot   ☐ L ☐ R
☐ Other: (Specify)

☐ MRA Thoracic Aorta
☐ MRA Abdominal Aorta
☐ MRA Kidneys
☐ MRA Lower Extremities
☐ MRCP

☐ MRI Chest
☐ MRI Abdomen
☐ MRI Pelvis
☐ MRI Pancreas
☐ MRI Testicles

*ransportation is provided when necess*

Macneal, kelly
HGH: 90335 DOB: 4/24/65
Mri of the Brain TBI/MRI/MRS
April 28, 2022



# I am running out of options....

1 message

**Mac Mac** ██████████gmail.com>                    Fri, May 6, 2022 at 1:17 AM
To: █████████████████████@lalezarian.com, █████cchr.nyc.gov, █████cchr.nyc.gov,
Svasquez@nysenate.gov
Bcc ███████████gmail.com

My oxygen is low again (see photo).  I am having chest pains and shortness of breath.  And MY HEAD
IS EXPLODING IN PAIN.... THROBBING THROBBING THROBBING!!!!!!!!!!!!!!!!!

I am gong to kill myself if this doesn't stop!  I have no where else to escape to and I CAN NOT LIVE LIKE
THIS!!!!!!!!!!!!!!!

You are killing me slowly.... why should I suffer.  I should just end it quickly... I can't stand the pain.


Kelly MacNeal
████

Sent from my iPhone



# Pulse oximetry

You may also be familiar with pulse oximetry. This measures your blood oxygen levels using a device that you clip onto your finger. It reports oxygen saturation as a percentage. Pulse oximeters are generally less accurate than an ABG test.

For most people, a normal reading falls between 95 and 100 percent, although this may be lower if you have a known lung condition or live at a high elevation.

If you're otherwise healthy and receive a reading of 92 percent or less on an at-home pulse oximeter, contact your doctor.

# What are the symptoms of hypoxemia?


ADVERTISEMENT                    ✕