EXHIBIT B

PROPOSED SECOND AMENDED COMPLAINT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
KELLY MACNEAL,                                    :
                                    Plaintiff,    :        23- cv-5890 – (LGS-JW)
                                                  :
            -against-                             :
                                                  :
THE CITY OF NEW YORK,                             :
                                    Defendant(s), :
---------------------------------------------------------- X


SECOND AMENDED COMPLAINT
OF
KELLY MACNEAL
Pro Se Plaintiff

<u>**TABLE OF CONTENTS**</u>                                                    **Page**

**PRELIMINARY STATEMENT**………………………………………………………2

**PARTIES**……………………………………………………………………………4

**JURISDICTION AND VENUE**…………………………………………………...5

**STATEMENT OF FACTS**…………………………………………………………6

      **BACKGROUND**

           **Plaintiff's Victimization and Need to Seek Assistance From**
           **Defendant CCHR to Enforce FHA and ADA law**

      *Residence and Lease Details*……………………………………………...6

      *Disability and Needed Accommodations*……………………………………6

      *Violations of Plaintiff's Rights by Her Landlord and Neighbor*………………………...7

**DEFENDANTS' RESPONSE TO PLAINTIFF'S REQUEST FOR HELP :**
**ACTIONS RESPONSIBLE FOR CLAIMS IN THIS COMPLAINT**

      *Approaching CCHR for Assistance*………………………………………...11

      *CCHR Diminished Plaintiff's Disability Claims and compared them to*

          *racial discrimination claims in an unrelated case*…………………………...13*

      *CCHR Diminished Disability Needs Compared to Drug Addiction*……………………14

      *CCHR Misrepresented Disability Law and Denied Protection*……………………………14

      *Misrepresented Plaintiff's protected class status under NYC Civil Rights Code*

          *and denied her protection based on her race*……………………………...15*

      *Refusal to file any complaint while demonstrating racial preference for defendant*…………16

      *Pattern of racially bias behavior and discrimination*………………………………...18

      *Retaliation and unlawful imprisonment*…………………………………...24

**ACTIONS OF THE NYPD AND FDNY-EMT'S**

      *Failure to Properly Assess All Facts*…………………………………………28

      *Plaintiff was Physically Abused and Her*

      *Disability Rights were Egregiously Ignored*…………………………………30

      *Warrantless Search and Theft of Papers*……………………………………35

      *Humiliation and Embarrassment*……………………………………………35

      *False Imprisonment and Defamation*………………………………………...36

      *Permanent Emotional and Physical Damage*………………………………36

**CAUSES OF ACTION**……………………………………………………………37

**JURY DEMAND**………………………………………………………………...40

**RELIEF**……………………………………………………………………………40

1

Plaintiff, Kelly MacNeal, complaining of the Defendant(s), The City Of New York and those agents and officers, named here in, employed by and/or acting in their individual and/or an official capacity for The City of New York, alleges as follows:

## PRELIMINARY STATEMENT

1. Plaintiff, Kelly MacNeal, brings this action *pro se.*

2. Plaintiff is a Caucasian female and has been classified as physically disabled by the Social Security Administration since April 29, 2015.

3. Plaintiff brings this action against the City of New York for its municipal liability in (i) the New York City Commission on Human Rights (CCHR), (ii) SAPNA RAJ, in her official capacity as Deputy Commissioner of the New York City Commission on Human Rights, (iii) JACQUELINE RIOS, in her official capacity as Agency Attorney at the New York City Commission on Human Rights, (iv) the New York Police Department (NYPD) and BRYAN HANSON, NICKOLAS ALAVANJA, DYLAN DARNAUD, BRENDAN MCGOVERN, NICK MICKOVIC and CONNOR COGHLAN in their official and individual capacities as NYPD officers and (v) the New York City Fire Department Bureau of Emergency Medical Services (FDNY-EMS) and FDNY- Emergency Medical Technicians (EMT's): FDNY-EMT HERNANDEZ (badge 434), FDNY-EMT MICHELLE LUZZICONE (badge 2819) and FDNY-EMT Lt. BESEMER in their official and individual capacities as New York City Fire Department Bureau of Emergency Medical Services personnel.

4. Plaintiff's interactions with the Defendants were marked by a series of injustices born from her desperate attempt to get the City to enforce her disability rights. Instead of

helping Plaintiff, CCHR, an agency established for the stated purpose of enforcing

civil rights, dismissed legitimate disability-related violations committed by her

landlord and in the process misrepresented the legal protections afforded by the laws

which defined Plaintiff's rights.  CCHR not only misstated Plaintiff's rights and sought

to deter her from pursuing them, but exhibited a clear bias that undermined her efforts

to seek protection and assistance from their agency.   This was not the first time CCHR

treated the Plaintiff in this manner … it in fact was a pattern of behavior.

5.  CCHR's actions also incited a police action against Plaintiff, which resulted in further

violations of her disability rights.  The named officers and EMT's committed

egregious physical and psychological abuse of the Plaintiff and exhibited a gross

disregard for Plaintiff's disability rights.

6.  Officer Coghlan also performed an unauthorized search of Plaintiff's bag without her

knowledge or consent and photographed her identification card and benefit card in

violation of Plaintiff's constitutional rights.

7.  Plaintiff was forcibly subjected to an unnecessary psychological evaluation and held

against her will, constituting unlawful imprisonment.

8.  The Plaintiff's health and well-being have been severely and permanently impacted by

the Defendant's actions, and she seeks redress for the harm caused.

9.  A pattern of racially biased behavior and discrimination exhibited by CCHR, and the

disregard for Plaintiff's disability rights exhibited by NYPD officers and FDNY-

EMT's warrant legal action to ensure that such injustices are addressed and that the

Plaintiff receives the protection and assistance she deserves under the law.

10.   Therefore, Plaintiff brings this action against the City of New York and it's named

employee Defendants to remedy Defendants': unlawful racial discrimination, failure to render service and ensure equal protection, conspiracy to misrepresent the law under color of law, acting in a retaliatory manner, failure to accommodate Plaintiff's disability needs, excessive force, unlawful imprisonment and unlawful search and seizure.

11. Plaintiff seeks punitive and compensatory damages for physical and emotional pain and suffering sustained and endured, leading to permanent damage to Plaintiff, due to Defendants' actions.

12. Plaintiff seeks damages for City employees' failure to observe ADA laws and use due care during the police action and for CCHR's refusal to offer equal protection of ADA and FHA laws when Plaintiff sought enforcement of those laws against her abusive landlord.

13. Plaintiff further seeks punitive and compensatory damages for extreme emotional distress and damage to reputation caused by intentional and unnecessary public humiliation during the police action incited by a report from CCHR.

## PARTIES

14. Plaintiff, Kelly MacNeal, resides at 507 W 28th Street, in the state of New York, in the country of New York and is a citizen of the United States.

15. Defendant is the City of New York, a municipal entity with a service address at 100 Church Street, New York, New York 10007.

16. Defendant The New York City Commission On Human Rights (CCHR) is a legal entity and a subdivision of the City of New York.

17. SAPNA RAJ and JACQUELINE RIOS are employees of CCHR.

18. BRYAN HANSON,  NICKOLAS ALAVANJA,  DYLAN DARNAUD and
    BRENDAN MCGOVERN are officers of the New York City Police Department with a
    service address at: NYPD 10th Precinct, 230 West 20th Street, New York, NY 10011.

19. NICK MICKOVIC and CONNOR COGHLAN are former officers of the New York
    City Police Department with a service address at: 1 Police Plaza, Room 110A, New
    York, NY 10038.

20. Upon information and belief, FDNY-EMT HERNANDEZ (badge 434), FDNY-EMT
    MICHELLE LUZZICONE (badge 2819) and Lt. BESEMER  are New York City Fire
    Department Bureau of Emergency Medical Services personnel. And Upon information
    and belief their service address is: Fire Department of the City of New York, 9
    Metro Tech Center, Brooklyn, NY 11201.


## JURISDICTION AND VENUE

21. Jurisdiction is proper in federal court under federal question jurisdiction.

22. Venue is proper in the Southern District of New York because the events leading
    to this action took place in SDNY jurisdiction.

23. This court has jurisdiction under the state law claims under supplemental
    jurisdiction.

## <u>STATEMENT OF FACTS</u>

### BACKGROUND
### Plaintiff's Victimization and Need to Seek Assistance From
### Defendant CCHR to Enforce FHA and ADA law

#### *Residence and Lease Details*

24. The Plaintiff resides in an "affordable unit" within a building subsidized by the New

    York State 421-a tax abatement program, which promotes mixed-income occupancy

    (80% market-rate/20% affordable).

25. The Plaintiff's lease commenced on September 25, 2017.

26. Compliance with distribution of the affordable units was overseen by Housing

    Preservation and Development (HPD), which required Plaintiff's specific unit to be

    designated as both an "affordable unit" and a "disability accessible unit" to meet the

    affordable housing guarantees which formed the basis of the Landlord's tax abatements

    agreement.  The apartment was awarded to the Plaintiff in a public lottery based on her

    disability status.

#### *Disability and Needed Accommodations*

27. Plaintiff is legally deemed disabled by the Social Security Administration and receives

    SSD payments as a sole source of income.  Her disabilities are documented results of a

    traumatic brain injury (TBI) and injuries to her back, neck and arm causing

    radiculopathy.  She ambulates with a cane or rollator and struggles with pain

    management.

28. Plaintiff requires access through the electronic doors at the street entrance to her building

    and can not use the alternative manual revolving door when using her rollator.

29. Plaintiff's landlord is aware of her disability status and the specific designation of Plaintiff's unit as a disability accessible "set aside" within the affordable units in the building. The unit includes such amenities as wheelchair-accessible appliances, grab bars, and flashing fire alarms as part of the accommodation requirements that are unlike other units in the building.

30. The Plaintiff's lease, like all others in the building, includes a "no smoking" clause, classifying the entire building as "smoke-free."

31. Plaintiff's TBI heightens her sensitivity to physical irritants such as chemical fumes and specific visual and audial stimuli. This makes her extremely vulnerable to migraines, nausea and vertigo triggered by exposure to these stimuli.

32. Protection from second-hand smoke and chemical fumes for chemically sensitive disabled persons is covered under the Fair Housing Act.

### *Violations of Plaintiff's Rights by Her Landlord and Neighbor*

33. From the first week Plaintiff took occupancy of her new apartment, in it's newly constructed building, there were problems. Water damage plagued the building … Plaintiff's apartment in particular. To the date of this amended complaint there have been 26 wall destroying water leaks in Plaintiff's unit. The water comes from, not only leaking plumbing, but has also seeped in from exterior walls due to shoddy construction. Plaintiff has had to call the Department of Buildings twice leading to inspections that resulted in fines for the landlord for "failure to maintain the building in a code compliant manner."

34. There were extended periods … months on end … when the electric doors at the front entrance would break down. This would require the worker at the front desk to get up,

come around the desk, walk to the front door and pry it open manually each time Plaintiff

needed to enter or exit the building through this sole disability accessible egress. The

electronic sliding doors had no handles, so when broken down, had no means by which to

open them without assistance.

35. Plaintiff's neighbor has refused to abide the "No Smoking" policy of the building and

caused chemical fumes to chronically enter Plaintiff's apartment, triggering constant

migraines and making Plaintiff violently ill as a consequence of their impact on

Plaintiff's TBI.

36. But things became truly unacceptable when Plaintiff's realized her chronic migraine's

from her traumatic brain injury had become so intractable, since moving into the

building, because of powerful formaldehyde fumes that were saturating her apartment

every night as she slept.

37. The downstairs neighbor was heating a floor cleaner called Fabuloso and using it to cover

the smell of lease-violating cigarette smoke.

38. Plaintiff's pleas to management for relief were scoffed at.

39. Plaintiff was getting sicker and sicker each day.

40. On April 7, 2018, after a week of violently throwing up from the powerful fumes entering

her apartment and being too dizzy to stand up, Plaintiff had to call an ambulance to take

her to the hospital. And while the hospital noted her dizziness, it needs to be

acknowledged that Plaintiff's condition immediately began to improve upon removal

from her apartment's toxic environment.

41. After the hospital visit, Plaintiff tried again to reminded her landlord of the parameters of

her disability, including her head injury, and her need of special accommodations to

8

protect her from migraine triggering chemical fumes… including smoking and vaping…
and the incredibly toxic and dangerous "off-label" use of a floor cleaner her neighbor was
using to cover the smell of smoke.

42. It must also be noted that Plaintiff did, in fact, on numerous occasions smell the actual
smoke the neighbor was trying to hide with the Fabuloso.

43. Plaintiff then supplied her landlord with the above referenced hospital records, along with
a brain MRI report from March 27, 2018, which noted anomalies consistent with physical
evidence of the migraines Plaintiff had been complaining about.

44. After being threatened with legal action, Plaintiff's landlord agreed to a mediation
process in late-April 2018.

45. The fumes stopped.

46. But chronic wall damaging water leaks continued to plagued Plaintiff's apartment… 21
in five years. (see Further Background below) and the relationship between Plaintiff and
management continued to deteriorate.

47. Then the front disability doors began breaking down on a regular basis … and remaining
broken for months at a time.

48.  Plaintiff's complaints were met with ridicule and retaliation.

49. After years of escalating confrontations, the treatment of Plaintiff became truly abusive.
Management instructed building staff to ignore Plaintiff's complaints and refuse her the
respect and services afforded other tenants.

50. Building staff were told to not speak to Plaintiff, but to just refer her to the office on
Long Island.   At which point, the management team would refuse to answer the phone or
return voicemail or email messages.

51. The egregious behavior took a particularly humiliating turn on April 29, 2021, with a confrontation between one of the doormen and the Plaintiff. It concerned the broken disability entrance doors. The doorman mocked the Plaintiff's need to use the doors and refused to open them while leaving her standing outside in the rain.

52. Plaintiff's subsequent complaints against the building and her request that the doorman involved be fired, set off what Plaintiff has perceived to be a concerted effort to harass her out of the building.

53. By June 2021 the fumes entering Plaintiff's apartment had returned as a daily, chronic problem and though, all leases in the building contain "no-smoking" riders, management not only refused to assist Plaintiff in stopping the source of the fumes, but ran interference to protect the violator.

54.  Management facilitated the lease violating activity by lying on numerous occasions to both the Plaintiff and her upstairs neighbor, who was also suffering ill effects from the fumes.

55. Management completely ignored Plaintiff's disability needs, and all her requests for "accommodations", to be protected from exposure to the chemicals entering her apartment.

56. This was true even after Plaintiff purchase an air quality monitor to prove what was entering her apartment.

57. Management refused to enforce their own "no-smoking" policy despite being made aware of Plaintiff's level of pain from migraines triggered by the fumes.

58. Thereafter, Plaintiff's landlord refused to fully participate in good faith in any further meaningful negotiations. The circumstances increasingly appeared to be a convenient source of harassment designed to force Plaintiff out of the building.

59. In April 2022, Plaintiff's upstairs neighbor, moved to another apartment in the building to escape the fumes. Her problem, ironically got worse. In April 2023, to protect her children's health, she moved her family out of the building altogether.

### DEFENDANTS' RESPONSE TO PLAINTIFF'S REQUEST FOR HELP : ACTIONS RESPONSIBLE FOR CLAIMS IN THIS COMPLAINT

#### *Approaching CCHR for Assistance*

60. On March 22, 2022, as Plaintiff's health continued to deteriorate and her physical pain and emotional distress became more and more unbearable, she approached Defendant, the New York City Commission on Human Rights (CCHR), seeking protection and assistance with filing Americans with Disabilities Act  (ADA) and Fair Housing Act (FHA) claims against her landlord.

61. The core of Plaintiff's request for protection centered on:

    a.  the toxic fumes entering her apartment

    b.  chronically broken disability doors

    c.  discrimination and abuse by management based on Plaintiff's affordable tenant status

    d.  retaliation due to complaints filed with the Department of Buildings and HPD.

62.  A full phone intake session with Defendant, CCHR was scheduled for April 12, 2022 with Defendant, Jacqueline Rios, Agency Attorney, Law Enforcement Bureau (LEB) conducting the interview.

11

63. On the day of the intake session, Plaintiff emailed Ms. Rios a detailed written breakdown of her history with the building management and a breakdown of her specific complaints, as well as 5 video clips supporting her allegations.

64. Two, of the 5 video clips, provided to CCHR, show the Plaintiff imploring a doorman named Sammy to explain his abusive behavior, only to have him hurls even more deeply offensive insults and abuse at the Plaintiff and deny her services.   This was one of the building staff members who publicly humiliated Plaintiff by mocking her need to use the disability doors.

    a.   One of these two videos begins by specifically referencing the issue with the broken disability doors and was recorded because the Plaintiff was forced to come downstairs from her apartment after Sammy, was playing abusive mind games. He pretended to be a different staff member and then hung up the phone on the Plaintiff while she was attempting to call in a complaint about fumes entering her unit.  It must also be noted that Plaintiff explained to CCHR that management ultimately did have to fire this doorman, but only because of his impersonation of another staff member and that staff member's objections.  Sammy, was not fired for other videos of his abuse of the Plaintiff… apparently because his behavior represented the overall stance of management.

    b.   The second video of Sammy shows him overtly saying he refused to do his job specifically for the Plaintiff and again hurls emotionally abusive insults and even mocks Plaintiff's tears of distress.

65. The other 3, of the 5 video clips sent for the intake conference with CCHR, showed the Plaintiff in her apartment with a dangerously low blood oxygen level reading on her oximeter and dangerously high toxic formaldehyde readings on her air quality monitor.

66. Despite the evidence provided to Ms.Rios, Plaintiff's desperate pleas for assistance in filing a formal complaint against her landlord were met with:

    a.   unreasonable resistance

    b.  misrepresentation of the law, under color of law

    c.  and a clear racial bias.

### CCHR Diminished Plaintiff's Disability Claims and compared them to racial discrimination claims in an unrelated case

67. Despite Plaintiff's situation causing her extreme physical pain, endangering her health and clearly violating her disability rights, Ms. Rios, compared Plaintiff's claims to another case CCHR had lost in court the prior month (Francis v King Park Manor Inc et al, 2nd U.S. Circuit Court of Appeals, No. 15-17823). The two cases bore little commonality other than they both involved a landlord and the behavior of a neighbor. The Francis case concerned an African American who claimed that his neighbor harassed him on multiple occasions with racist language.

68. Ms. Rios stated, "If we could not win that case for that poor black man, then we won't file a case against your landlord."

69. Ms. Rios added several more statements about how deeply felt her emotional reaction to the Francis case was and simultaneously diminished the importance of Plaintiff's physical pain and suffering.

### *CCHR Diminished Disability Needs Compared to Drug Addiction*

70. Ms. Rios went on to propose hypothetical defenses for Plaintiff's fume producing neighbor by suggesting "they may be trying to get off of something harder".

71. She elaborated enough to make it clear that she was referring to drugs and suggesting that a drug addict's needs would trump any disability protections the Plaintiff was seeking.

### *CCHR Misrepresented Disability Law and Denied Protection*

72. Plaintiff cited Poyck v Bryant, et al (2006) as a case more in alignment with her legal objectives. In that case, second-hand smoke fumes were found to be in violation of habitability laws. Plaintiff tried to explain to Ms.Rios that her claimed rights went even further due to her disability needs. But, Ms. Rios remained unmoved and stated the Plaintiff had no viable claims under disability or housing laws.

73. As it became clear that Ms. Rios was putting up too much resistance on the fume issue, Plaintiff attempted to bring in the subject of the chronically broken disability doors and the doorman's acts of embarrassing and humiliating the Plaintiff's need to use them.

74. Ms. Rios dismissed Plaintiff's complaints out of hand and stated that she was not interested in what she considered expectations of "concierge" service.

75. This was the first of two times Ms. Rios used the word "concierge" in reference to the Plaintiff. And it became clear from her overall attitude that she could have just as easily used the phrase "white privilege."

76. This was even after Plaintiff explained that the doors were of the sliding variety, had no handles and required two hands to pry open when in their broken state. The only other entrance is a revolving door, which Plaintiff's walker can not get through.

77. Ms. Rios, inexplicable claimed that Plaintiff's "expectations" concerning the disability doors were beyond the scope of disability law protections.

### *Misrepresented Plaintiff's protected class status under NYC Civil Rights Code and denied her protection based on her race*

78. When Ms. Rios could not be moved on any subject relating to Plaintiff's disability needs, Plaintiff made an appeal to file a claim of discrimination based on the landlord's differential treatment of her due to her status as an affordable tenant.

79. Plaintiff cited a neighbor two doors down from her on the same floor. This neighbor was a market-rate tenant with a pregnant wife. He threw a few angry fits about smoke fumes entering his apartment and the building staff made serious efforts to stop the offender.

80. Ms. Rios, responded by telling Plaintiff that she could not claim discrimination based on being an affordable tenant "because that legal status was only meant to protect minorities, because most affordable tenants are minorities."

81. Plaintiff cited the "poor door" case that CCHR brought against another building that, like Plaintiff's building, was an "80/20" mixed income rental. In that case the landlord tried to force the 20% of tenants, who were in affordable apartments, to enter through a separate door.

82. The court found the landlord's actions in the "poor door" case to be discriminatory based on New York City's Civil Rights Code, which recognizes subsidized tenants as a protected class under the umbrella classification of "source of income".

83. Ms. Rios, again pushed back against Plaintiff and falsely insisted that the case was only brought by CCHR because most affordable tenants are minorities.

84. Ms. Rios then stated that since Plaintiff was not claiming to be a minority than Plaintiff was not protected by the law and, because of this, CCHR would not file any complaints for her on that basis.

***Refusal to file any complaint while demonstrating
racial preference for defendant***

85. By the end of the intake conference, the only action Ms. Rios agreed to take was making a courtesy call to Plaintiff's landlord to ask them to voluntarily assist the Plaintiff, but made it clear that she did not intend to file a formal complaint.

86. Plaintiff made a concerted effort to conceal her anger and frustration because CCHR seemed to be her last hope of getting any help to resolve her problems and find protection for her disability rights.   Plaintiff had already sought assistance from Housing Preservation and Development (HPD), The Mayor's Office for People with Disabilities, Mayor's Office to Protect Tenants, New York Dept. of Health and Hygiene and even the Environmental Protection Agency (EPA).

87. As a last ditch effort to appeal Ms. Rios' disinterest and misrepresentations of the law, Plaintiff ask to speak to the supervisor whom Ms. Rios claimed was reinforcing the legal interpretations she had presented to Plaintiff.

88. Ms. Rios agreed to have the supervisor call Plaintiff.

89. Ms. Rios then also agreed to look at further evidence Plaintiff wished to share with her via email.

90.   Plaintiff spent the rest of the day on April 12, 2022, forwarding Ms. Rios dozens of emails containing photos, videos, texts and documents to reinforce her claims against her landlord.

91. Ms. Rios did not acknowledge receipt of, or address anything that was sent.

92. Plaintiff began to worry that if Ms. Rios contacted Plaintiff's landlord and conveyed the weak and legally flawed position she had presented Plaintiff with, it would only encourage the landlord's arrogance and misbehavior.

93. Plaintiff sent several emails and made numerous phone calls attempting to reach Ms. Rios in order to head off her actions until Plaintiff could further confer with Ms. Rios' supervisor.

94. But, Ms. Rios would not respond.

95. Plaintiff finally reached Ms. Rios by phone at 1 pm the following afternoon, April 13, 2022.   At which time Ms. Rios told off the Plaintiff for expecting her to respond and accused Plaintiff of expecting "concierge" service … "which the CCHR does not supply," she added.

96.  Ms. Rios' supervisor, Defendant, Ms. Sapna Raj, finally returned the Plaintiff's call on April 14, 2022, two days after the request was made.

97. Ms. Raj was rude and reiterated the racist interpretation of the law presented by Ms. Rios, stating that Plaintiff could not seek affordable tenant discrimination protection due to her not being a minority.

98. Ms. Raj also completely disregarded Plaintiff's disability claims and dismissed the precedent case (Poyck v Bryant, et al), which Plaintiff had asked her and Ms. Rios to look into.

99. Neither Ms. Rios nor Ms. Raj would address any of the evidence sent to them in the many emails following the intake conference.  And Plaintiff's questioning their legal positions appeared to ignited an overtly hostile attitude.

*Pattern of racially bias behavior and discrimination*

100.     Hence, Plaintiff followed up the phone call with Ms. Raj by sending an email

putting her on notice that CCHR's failure to act in defending Plaintiff's disability rights

would be considered a pattern of behavior that would be reported to The Department Of

Investigations (DOI).

101.     Plaintiff notified Defendants that her claim of "a pattern of behavior" was

supported by CCHR's prior behavior in another case brought to them by the Plaintiff in

2016. (Kelly MacNeal v New York City Department of Homeless Services, Camba,

Project Renewal Inc., et al  M-H-DR-17-11266,  M-H-DR-17-23372,  M-H-DR-17-

23377).

102.     Plaintiff's disability rights were so egregiously violated while she was in the New

York City Homeless Shelter system, that she was beaten and bruised on more than one

occasion for simply trying to enforce her disability rights.

103.     The maltreatment in the shelter was tainted with a stench of racism, as Plaintiff's

medical condition and numerous doctors' notes explaining her need of accommodations

(such as access to her bed during the day) were regarded as a sort of "white privilege" by

a staff that were entirely made up of black and Hispanic employees.

104.     The level of violent animus from the shelter staff was enough to shock the

conscience.  Yet, after CCHR filed the initial complaint, they became aware that

Plaintiff's evidence revealed an underlying racist nature of much of what had gone on

and CCHR chose to close the complaint without issuing any decision.

105.     On August 29, 2018, a Notice of Administrative Closure was signed stating,

"prosecution of the complaint will not serve the public interest."

18

106.    Evidence suggests that CCHR are, themselves, guilty of anti-Caucasian bias.

107.    This is true to such an extreme that CCHR is willing to misrepresent the law in order to deny their services and refuse aid to non-minorities, even if that person is disabled and in eminent danger of physical harm or experiencing extreme pain and suffering.

108.    After Plaintiff sent Ms. Raj an email on April 14, 2022, expressing her thoughts on making a report to the Department Of Investigations.  Ms. Raj replied with an email claiming CCHR was engaging in what they call "early intervention".

109.    What followed was the realization of Plaintiff's worst fears.  CCHR indeed emboldened Plaintiff's landlord.   Without ever consulting with Plaintiff again, for rebuttal or clarification on any detail, CCHR contacted the landlord and offered them guidance on a list of  "accommodations" which CCHR would find acceptable.

110.    These suggestions, and Plaintiff's rejection of them, was later sited in the CCHR dismissal letter.  The problem was, the list was totally inappropriate and as legally flawed as their other legal interpretations.   These suggestions included:

a.   Taping up Plaintiff's vents … which was a building code violation.

b.   Purchasing an air purifier for the Plaintiff … when Plaintiff already owns a Dyson, which is commonly recognized as THE premium brand of such devices. This suggestion is also contradicted by the EPA, whose own guidance states that, "secondhand smoke cannot be controlled by ventilation, air cleaning, or…" . Plaintiff can definitively testify to the truth of EPA's statement, based on her own experience.

    c.  Changing filters in Plainiff's HVAC and washing machine …. though neither of these was the source of the fumes.  Nothing inside Plaintiff's apartment produced the fumes or the fumes would have been present 24 hours a day and never abated. The fumes had become fairly chronic, but did wax and wain.

    d.  And, the final insult was the suggestion that Plaintiff be constructively evicted from her apartment and either move to another unit or out of the building altogether …  This was proposed with a straight face, as everyone showed horror at the mere suggestion that the neighbor actually violating the lease and the building rules be threatened with eviction (if she refused to stop violating the lease)

111.    All of these options were presented to Plaintiff through her landlord with the caveat that they were constructed by CCHR and that if Plaintiff did not accept them as a solution, then CCHR had assured the landlord that they did all they were expected to do legally.

112.    When the Plaintiff rejected the completely useless and unacceptable suggestions … for the reasons enumerated above (96 a-d), the landlord reported this back to CCHR. And, indeed the landlord has become even more emboldened and abusive since.

113.    No one from CCHR, not Ms. Rios nor Ms. Raj, ever contacted Plaintiff, after the April 14, 2022 email, for any sort of rebuttal or clarification on any information the landlord offered up after CCHR made contact with them.

114.    As a matter of fact, the one and only email Plaintiff ever received from Ms. Rios, was the April 22, 2022 transmission of her official rejection letter.  (Exhibit 1)

115.     In the letter Ms. Rios repeats a number of slanderous lies told by Plaintiff's

landlord and maliciously warps and twists Plaintiff's position on a number of issues

including:

a.  She completely ignores that Plaintiff's claim began with broken disability doors,
    denials of service and other problems and escalated to a war of retaliation ... the
    fumes of which are now a central weapon.  She doesn't even mention this
    foundation of the case.

b.  She also conveniently leaves out any mention of Plaintiff's request for protection
    from discrimination as an affordable tenant and her response concerning race.

c.  She goes on to stress that Plaintiff was uncooperative in negotiations with the
    landlord for failing to agree to CCHR's useless and unlawful suggestions.

d.  Ms. Rios' views were so warped and biased in her letter, that she went so far as to
    accuse Plaintiff of harassing the tenant who was harassing the Plaintiff.   She even
    tries to insinuate that when the Plaintiff placed a cease and desist letter under
    neighbor's doors, it was some kind of unacceptably vile act.

e.  Ms. Rios also tries to use against Plaintiff, the fact that Plaintiff confessed to the
    use of a back vibrator on the floor as a noise deterrent when the fumes became
    overly strong in the middle of the night.  Ms. Rios conveniently leaves out the fact
    that this was also implemented by Plaintiff to prove that the downstairs neighbor
    was the source of the fumes.  It was successful in that a form of communication of
    answer and response developed:  fumes start ... noise starts in reply... fumes
    stop.... noise stops.... fumes resume... noise resumes.... fumes stop... on and on
    and on ...  in a war that would last all night, every night.   But the telling aspect of

this was, the downstairs neighbor is the only person who could hear the noise. Thus, if the fumes stopped in reaction to the noise, there is only one possible source. This eliminated all other suspects the landlord kept claiming prevented them from taking action.

f.  Ms. Rios also refers to the harassing neighbor as "elderly" and slanderously implies that Plaintiff  has been harassing an elderly woman.  The fact is, the downstairs tenant is only 14 years older than the Plaintiff, the age of her sister, not her mother.  And even more importantly, the tenant has a daughter, much younger than the Plaintiff, whose has been illegally occupying that subsidized unit which was meant for a disabled person.  The mother spends large portions of the year out of the country and the daughter seems to be the main tenant of the apartment. Which would suggest the apartment was obtained under false pretenses in the lottery.  For some unknown reason, the building seemed unconcerned with the illegal occupancy.  Perhaps, because the daughter has become such a convenient tool of harassment to retaliate against Plaintiff.

g.  Ms. Rios goes to some length to vilify the Plaintiff's requests for the other tenant's eviction, while ignoring the solid legal basis on which that expectation is based.   This is while, ironically, she displays no qualms about suggesting the Plaintiff be forced from her apartment.  At the very least, the Plaintiff simply wanted building management to enforce their own lease policy and make it clear to the other tenant that eviction was a real threat  IF, (stress added) she refused to abide the lease provisions including the no smoking clause and the nuisance clause (which covers the other toxic chemicals, including cleaners and such,

which the tenant  was aerosolizing with heat to mask the smell of the smoke.

Those were the fumes that sent Plaintiff to the ER twice in 2018.)

116.    As inappropriate and slanderous as many of the inferences in Ms. Rios' dismissal

letter were, perhaps the most egregious was unstated in any direct manner and simply

achieved through her bias stance.  The Plaintiff's harassing neighbors are named Idalia

and Joselyn Martinez.   Their minority status seems to have once again influenced the

CCHR to apply a racial bias to their enforcement of the law when suggesting Plaintiff

should move and not the minority lease violating harassers.   Plaintiff, gave Ms. Rios the

names of those tenants during the intake interview, as Plaintiff questioned whether the

tenants themselves should be named in any complaint.

117.    It would appear that CCHR only went through the motions of pretending to

"help" Plaintiff because of her threat to report, to the DOI,  CCHR's egregiously racist

statement when denying Plaintiff the ability to claim "affordable tenant" discrimination.

118.    But, in actual fact, for the second time, CCHR's racial bias was not the sole

problem.

119.    CCHR's racial bias so overwhelmed their reason, that it led to them actively

conspiring to deny Plaintiff's disability rights, and condone the behavior of a proposed

defendant, by means of intentionally proffering a gross misreading of ADA and FHA

law.

120.    The slanted and legally unsound rejection and handling of Plaintiff's most recent

2022 case, on the heels of Plaintiff's 2018 DHS case dismissal, show a pattern of racial

bias influencing how the CCHR accept and handle cases.

121.    Because of this Plaintiff began to realize her only route to justice was to, ironically, file a discrimination case against CCHR.

122.    On April 28. 2022, Plaintiff notified CCHR, by email, of her intent to sue, but still left them opportunity to alter course and assist Plaintiff in a meaningful way.

123.    CCHR did not respond to any further emails.

124.    The complete failure of the process left Plaintiff still in agonizing daily pain. Merriam-Webster defines the verb form of the word "torture" to mean: 1. to cause intense suffering; to torment, 2. to punish or coerce by inflicting excruciating pain. By this definition, Plaintiff continued being tortured every day and every night in her own home.

### *Retaliation and unlawful imprisonment*

125.    The callousness with which Ms. Rios, Ms. Raj and Plaintiff's landlord were able to disregard Plaintiff's claims of pain, made it necessary to attempt to make them understand, through some as yet untried language. Plaintiff continued to copy Ms. Rios and Ms. Raj on several emails addressed to her landlord. These emails documented her pain and medical progress.

126.    April 29, 2022, an email was sent about a specialized Traumatic Brain Injury MRI Plaintiff had undergone the day before, as a follow up to another specialized brain MRI done the previous summer. This was the 6th brain MRI since Plaintiff's accident and the 3rd since moving into the toxic environment of her current apartment…which has substantially increased the level of pain she has been in on a daily basis. The constant exposure to the irritants exacerbating Plaintiff's TBI have made it nearly impossible to safely and properly monitor her condition and developments surrounding her chronic injuries.

127.    May 6, 2022, once again, prolonged overnight toxic fumes in Plaintiff's apartment

caused her blood oxygen level to fall to 92%, considered a medical emergency.   The

problem with documenting this in the past, had been, that by the time Plaintiff would

arrive at a hospital, and gone out in fresh air, she would begin to recover.  For this reason

Plaintiff purchased her own blood oxygen meter and an air quality monitor in an effort to

show what was happening to her inside her apartment.

128.    Despite Plaintiff's best efforts, and the hardships of expenses the Plaintiff can not

afford, her attempts to provide evidence were ignored by both the landlord and CCHR.

129.    Plaintiff became disgusted by all of these people, who were quite literally lacking

the humanity to care about a disabled person being tormented by horrible and

unnecessary levels of pain, and even deprived safe levels of oxygen in her own home.

130.    For this reason, on May 6, 2022, Plaintiff fired off an angry and sarcastic email,

which included a still photo of her 92% oximeter reading and explanatory literature of it's

meaning.   (EXHIBIT 2)

131.    In all honesty, Plaintiff hoped her "hail Mary", psychic scream would shake one

of the recipients to action and inspire them to help stop the invasive and toxic fumes that

were literally poisoning  the Plaintiff.

132.    Unfortunately, the members of Plaintiff's building management, as usual, just

completely ignored the email.

133.    But, even more unfortunately, CCHR, chose, not to help resolve Plaintiff's

situation, but instead use it as an excuse to terrorize Plaintiff and further slander her

reputation.

134.     This can easily be construed as retaliation for Plaintiff's stated intent to bring suit against CCHR.

135.     The language in the email stated that Plaintiff's oxygen was low and her migraine was "EXPLODING IN PAIN…"   She went on to state she was going to kill herself  "if" …. Stress… "if" this doesn't stop.   It was a plea for someone to come and actually make the fumes stop… not an expression of a wish to die.  It was a plea for any of these people to stop just standing by while Plaintiff was being physically tortured and in agony.

136.     Given Ms. Raj and Ms. Rios's familiarity with Plaintiff at this point, they had every reason to know that this email was hyperbolic. Plaintiff had not ever shown any means or plan to commit suicide, and Ms. Raj and Ms. Rios should have known that from their extensive interactions with Plaintiff.

137.     Plaintiff went on to make the sarcastic statement, "You are killing me slowly" (by lack of oxygen)  "… why should I suffer. I should just end it quickly… I can't stand the pain."   Which should have been properly read as " You heartless morons, don't you realize that it is a miracle of my will to live, that I have been able to survive the daily torment I have endured?",  or more comically,  "If I was less attached to life and perhaps a little smarter, I would just put myself out of my misery… but neither of those factors apply."

138.     And, again, Ms. Rios and Ms. Raj had every reason to know that these statements were hyperbolic.  Plaintiff did not enumerate any actual plan or means of committing suicide.  She was begging for help to end the physical cause of much of her pain.

139.     It should also be noted that an aid from State Senator Brad Hoylman's office, who had been trying to help Plaintiff, was also on the recipient list of that email and found no reason to take it as a serious suicide threat.

140.     If Plaintiff was suicidal, she wouldn't be trying so hard to solve the problem in her apartment.

141.     Defendants' employees should have known, from Plaintiff's perseverance in resolving her apartment issues, that her primary goal was fixing her living conditions, not ending her life

142.     Defendants made no attempt to contact Plaintiff or clarify the meaning of the message in the email.

143.     Instead, on May 6, 2022, CCHR used Plaintiff's email as the basis to make a knowingly false and malicious report to authorities identifying Plaintiff as a "suicide threat."

144.     This, as CCHR were quite aware, did nothing to help resolve any of Plaintiff's problems.

145.     Instead, it brought a terrifying S.W.A.T. team to Plaintiff's front door.   And whatever was reported made the responding authorities wrongfully treat Plaintiff as an armed and dangerous assailant.

146.     The following incident served to terrify and intimidate the Plaintiff, and ironically, only added to the abuse of Plaintiff's disability rights.

## ACTIONS OF THE NYPD AND FDNY-EMT'S

### *Failure to Properly Assess All Facts*

147.     On May 6, 2022, six New York City Police (NYPD) officers and three Fire

Department of New York Emergency Medical Technicians (FDNY-EMT's) arrived at

Plaintiff's door, stating they were there for a wellness check due to CCHR's report that

Plaintiff had threaten self-harm in an email.

148.     Plaintiff, suffering from fear induced by prior police assaults, ironically also

instigated by Plaintiff's attempt to defend her disability rights, chose to leave the latch on

her door while speaking with the officers, but did open the door and volunteer to answer

their questions.

149.     Plaintiff attempted to explain the sarcastic nature of her email and clearly stated

over and over and over again that she was not suicidal nor a threat to herself or anyone

else.

150.     EMT's Hernandez and Luzzicone, repeatedly misstate what Plaintiff kept  saying

in her explanation.  This is clearly evident on police body-worn camera (BWC) footage

Plaintiff has recently obtained.  The EMT's  keep claiming  that Plaintiff "said she ***wants***

to kill herself."  Which is demonstratively untrue on the BWC footage.

151.     The EMT's and Officers intentionally refused to give equal weight to any of

Plaintiff's explanations, though she went into great detail to explain her disability and

struggles to get assistance to protect her disability rights.  Plaintiff explained that she was

merely trying to get the recipients of the email to understand how much pain she was in

and how serious the violations of her rights were.  The violations were destroying

Plaintiff's life and causing her unbearable … and avoidable … excruciating migraines

due to her TBI.

152.    The officers remained unmoved and alternated between taunting Plaintiff with threats of breaking down her door and, alternatively, trying to persuade her to come out with promises that they would not harm her and would let her walk out to the ambulance on her own.  Mickovic even taunted the Plaintiff by saying "I'll hold you hand."

153.    When it became clear Plaintiff needed outside help to head off this unnecessary action, she phoned the lawyer who was representing her in the personal injury case centered around her initial disabling injuries. (please note, this lawyer has not been able to assist Plaintiff with this case or the claims against her landlord, as he does not practice in these areas of law or in Federal Court… Plaintiff is completely pro se here).  It was then arranged for Officer Hanson to call the lawyer from his own phone.

154.    Unfortunately, the BWC shows Hanson repeating the lies that the EMT's and CCHR were asserting.  He told Plaintiff's lawyer "she stated a *wish* to kill herself" and then claimed that Plaintiff said "she couldn't take this any more and that she *wanted* to kill herself."   Both of Hanson's quotes were completely untrue, but left Plaintiff's lawyer with no choice but to accept this information at face value.   He couldn't contradict them without risking his own liability.

155.    Plaintiff never expressed to anyone that she "wished" or "wanted" to kill herself and took pains to try to explain this.  However, when she overheard Officer Hanson repeating these lies, she gave up in exasperation … even before he got off of the phone with Plaintiff's lawyer.

156.    Plaintiff agreed to let them take her and stated that she would simply make the action a part of the lawsuit she had already threatened to file against CCHR.  And so here we are.

157.     Things should have proceeded calmly and orderly after that.  Plaintiff agreed to get dressed and submit, unwillingly, if only to head off the violence that was being threaten.  At this point ALL of the officers had been put on notice again and again about Plaintiff's disability status, chronic pain and vulnerable physical state.

### *Plaintiff was Physically Abused and Her Disability Rights were Egregiously Ignored*

158.     All the promises that Plaintiff would not be harmed disappeared the moment   she stepped across the threshold of her front door.

159.     Plaintiff's walking cane was ripped from her hand.

160.     Four officers, Coghlan, Mickovic, McGovern and Darnaud violently grabbed the Plaintiff and claimed they were required by policy to handcuff her.

161.     They flung Plaintiff out into the hall as Plaintiff cried out.  She, AGAIN, informed them that she was disabled.  They refused to pause or make any adjustment to their actions and insisted that handcuffing Plaintiff was required as a policy.

162.     Even as Plaintiff desperately proclaimed the distress the handcuffing was having on her injuries, she was ignored.

163.     The four officers twisted Plaintiffs injured arm and jerked her around violently without regard for her numerous back, neck and head injuries. These include, not only her TBI and neck injuries, but a painful chronic wedge fracture in her thoracic spine which has led to chronically painful and physically limiting scoliosis in her lumbar.   The officers' actions left the Plaintiff in so much pain she could barely stand up straight or walk forward.

164.     Based on the BWC it appears that Coghlan was the officer who applied the
handcuffs.  They were place on sideways and so tight they were cutting into Plaintiff's
wrists.

165.     Plaintiff cried out that the handcuffs were too tight and cried, "You are hurting
me."

166.     As she stood bent over and sobbing from the pain she was in, the officers and
EMT's decided to force Plaintiff into a flimsy "chair' conveyance.

167.     Plaintiff desperately tried to make them understand that the contraption they were
attempting to force her into was not appropriate and knew it would not properly support
her injured back.  Juggling which injury to address first Plaintiff cried out,  "I need these
handcuffs taken off of me. I have a broken back..  I have a broken back and a neck
injury."

168.     Even the Porter from Plaintiff's building can be heard on the BWC trying to
intervene by warning the assailants that "she has back issues."

169.     All pleas for accommodating Plaintiff's numerous injuries were totally ignored.
Not a shred of compassion, sympathy or even common decency was displayed by a
single one of these officers or EMT's.

170.     While being forced into the conveyance and pushed backward, so that Hernadez,
McGovern and Coghlan could strap her in, Plaintiff shrieked in pain again, "You are
hurting my wrists. These handcuffs are on side-ways!"

171.     A Still from the BWC shows Plaintiff's left hand swelling and turning red.

172.     After Plaintiff is strapped in, Hernadez says, "I'm going to lean you back."
Plaintiff desperately pleads with him to stop and says, "No!  These are hurting my wrist!"

She sobs "Oh my God. Oh my God!" as her full body weight is tilted backward and caused to press the handcuffs not only into her injured wrists, but they were then digging into her injured back.  This was nothing short of torture.

173.     In the elevator Plaintiff continues to sob in pain.  She howls in a desperate plea, "These handcuff are cutting off my circulation and I have an injury to my wrist" She was ignored.

174.     Plaintiff was then parked in the lobby for an unknown reason, which gave more of her neighbors an opportunity to see Plaintiff in this humiliating distraught situation.  Her hysterical sobbing made Plaintiff look truly unbalanced.  The fact that it was being caused by the intentional physical abuse of the Plaintiff by these officers and EMT's is not something casual bystander would generally comprehend.  Had Plaintiff been allowed to walk out on her own, this public embarrassment could, and should, have been avoided.  Plaintiff is not a criminal.  Nor is she mentally unbalanced.  But, was subjected to this humiliation because the City thought this was an appropriate response to Plaintiff begging for help to enforce her disability rights.

175.     While in the lobby Plaintiff continues to beg that the handcuffs be seen to because they were hurting her. And, again, she was told that the handcuffs were required by policy and so they would not be removed or adjusted.

176.     These statements were reiterated by the police officers and the FDNY-EMT's.

177.     The EMT Luzzione then took her turn at leaning the Plaintiff backward in the conveyance while dragging her out of the lobby. On the BWC you hear Plaintiff shriek in agony!  Her distress is more than clear.  She SCREAM S "MY BROKEN BACK!!!!  I HAVE TWO FRACTURES IN MY BACK!!!" as her back spasms from the abuse.

32

Luzzione did not pause for even a moment to show any concern for Plaintiff or employ her medical expertise to find out how to address her patient who was clearly in acute distress. She parked the Plaintiff out in the rain on the sidewalk and walked away.

178.     Eventually, Hernadez returned and, again, leaned Plaintiff backward to drag her the rest of the way to the ambulance. Plaintiff yelped like a tortured animal. She screamed, "NO! STOP IT! STOP IT! STOP IT! STOP IT!" as he callously ignored her and continued to inflict horrendous agonizing pain on the Plaintiff and cause unknown further injury to her existing condition.

179.     Once at the ambulance, it became apparent that the FDNY-EMT had their standard stretcher available for use the entire time, but chose not to use it. This choice was not deviated from, even as an accommodation for Plaintiff's injuries, when she made it clear how much pain their other conveyance was causing her.

180.     Use of the stretcher would have completely prevented the agony that was inflicted on Plaintiff. The EMT's had an option to transport her safely and appropriately and callously chose not to. There were numerous stops along the way where they had every opportunity to leave Plaintiff in the custody of the other officers and send at least one of the 3 EMT's to collect the stretcher. Yet, they chose to subject Plaintiff to intentional and unnecessary abuse, risking harm, and causing excruciating pain and severe emotional trauma due to the inhumane treatment.

181.     As they unstrapped the Plaintiff to transfer her to a stretcher, Plaintiff was in so much pain she could barely stand. The BWC shows Plaintiff literally quaking and quivering as she tries to stand. She is clearly physically traumatized and struggling to steady herself.

182.    Coghlan, uncuffed Plaintiff's right hand, but as he pulled on the cuff to attach it to the stretcher he pulled on Plaintiff's injured left wrist and hyper-rotated her injured arm. She screams in pain again.  EMT Lt. Besemer, scolded Plaintiff and says "No one is touching you!"  This was untrue and demonstrated just how oblivious these people were to what they were actually doing to the Plaintiff.  A still frame from the BWC shows that Coghlan was in fact twisting Plaintiff's wrist more that 180 degrees from normal.

183.    Plaintiff scream at Coghlan, and now that she had a free hand was able to point at her left wrist and show him what she was crying about.  Plaintiff screamed, "This is on my bone! It's on my bone" referring to the cuff improperly applied directly on Plaintiff's wrist bone.

184.    Once Coghlan finally addresses the handcuffs and adjusts them, the BWC footage reveals the redness of Plaintiff's wrist and the deep indentations from where the cuffs were digging into her wrists.

185.    As soon as Plaintiff was settled on the stretcher she was able to stop crying.  She was still in pain but, at least the active period of intense physical torture had ended.

186.    The fact that the stretcher had been available the entire time, made the abuse Plaintiff was subjected to by transporting her in the flimsy chair conveyance all the more puzzling and inexcusable.

187.    As a matter of fact, NO ONE with their hands cuffed behind there back, should be transported in a conveyance that causes the person's full body weight to press on their wrists, much less a disabled person with preexisting back and wrist injuries.   This was inhumane in the best circumstances.  But rose to absolute torture for the injured Plaintiff.

*Warrantless Search and Theft of Papers*

188.    The BWC footage, recently acquired by the Plaintiff, revealed that, while in the ambulance, Coghlan, who was sitting behind Plaintiff, signaled to EMT Luzzicone and asked her to pass him Plaintiff's bag.  Luzzicone took the bag from the seat next to her, which was within Plaintiff's eyeshot, and lied to Plaintiff, claiming she was putting it, along with Plaintiff cane, on the back of the stretcher for safe keeping.

189.    Coghlan proceeded to furtively and silently open Plaintiff's bag and search it without Plaintiff's knowledge or consent.

190.    He removed Plaintiff's wallet.

191.    Coghlan then removed Plaintiff's State ID card and Benefit card and photographed them with his phone.


*Humiliation and Embarrassment*

192.    This humiliation of the "scene" that was created in the lobby of Plaintiff's building while she was being subjected to such painful physical abuse, left a lasting impact on Plaintiff's relationship with her neighbors and her ability to live with dignity in her home.

193.     The spectacle also adversely affected the relationship Plaintiff has with her building staff and emboldened the abusive superintendent, who used the incident to tell other tenants that Plaintiff had been arrested and that she was mentally ill.

194.    To this day there are people in the building that actually believe these lies and are afraid to get in the elevator with Plaintiff, or they treat her in an unfriendly manner.

*False Imprisonment and Defamation*

195.     Meanwhile, the reality was that, after Plaintiff's totally unnecessary psychological

evaluation, she was not admitted to the hospital because she was clearly not suicidal or a

danger to herself or others.

196.     However, because of whatever was reported by the EMT's and police officers,

Plaintiff was still forced to spend the entire night in the observation area of the hospital.

197.     The fact that the hospital wouldn't let Plaintiff go immediately, even after it was

obvious that she was not suicidal, was false imprisonment, which appears to be directly

linked to statements made by CCHR, the EMT's and the police officers.

*Permanent Emotional and Physical Damage*

198.      Plaintiff is still bearing the psychological trauma of being physically assaulted

and then falsely imprisoned as a direct result of asking for help to stop the daily abuse she

was enduring in her apartment.

199.     The injustice and irony have left Plaintiff emotionally devastated and deeply

traumatized.

200.     And due to the delays in obtaining any help to protect her disability rights,

Plaintiff's health has continued to deteriorate, both mentally and physically.

201.     Plaintiff's most recent blood tests come back with abnormalities associated with

either cancer or an auto-immune disease.  Plaintiff had to undergo an MRI of her adrenal

glands and a sonogram of her thyroid.  Answers are still eluding the doctor.  Stress and

emotional distress seem to be a factor in Plaintiff's deteriorating health.

202.     The City and all agencies named in this complaint have not only refused to assist

this disable woman, but actually added to her abuse.

203.    Their actions have emboldened the very abusers from whom Plaintiff originally sought legal protection and caused the Plaintiff to continue suffering the original pain inducing daily abuse from which she has continuously prayed for relief.

## CAUSES OF ACTION

Plaintiff repeats and re-alleges the allegations made in paragraphs 1 through 203 of this Complaint as if set forth herein at length for each of the following causes of action:

204.    **I :** Plaintiff, brings this action against the City of New York for its municipal liability in Defendants at 3(i-iii) above, under 42 U.S.C. § 1981, 1983 for discrimination on the basis of race, in violation of the Fourteenth Amendment of the U. S. Constitution.

205.    **II :** Plaintiff, brings this action against the City of New York for its municipal liability in Defendants at 3(i-iii) above,  under 42 U.S.C. § 1985(3), for multiple agents misrepresenting the law, in concert, and by which mode, did conspire to deny, and did deny, Plaintiff equal protection under the New York City Admin Code Title 8 Civil Rights et seq. and New York Consolidated Laws. Civil Rights Law – CVR § 1 et seq , based on her race in violation of the Fourteenth Amendment of the U. S. Constitution.

206.    **III :** Plaintiff, brings this action against the City of New York for its municipal liability in Defendants at 3(i-iii) above, under 42 U.S.C. § 1981,1983, 1985(3), 1986 for multiple agents misrepresenting the law, in concert, and by which mode, did conspire to deny, and did deny, Plaintiff equal protection under the law with regard to her rights under the Americans with Disabilities Act (ADA) and the Fair Housing Act (FHA) and did show negligence to prevent her abuse and harm due to such lack of protection by these laws and  42 U.S.C. Chapter126.  This is particularly egregious as, protecting

citizen's from violations of ADA and FHA laws are among the stated purposes of the existence of CCHR.

207.    **IV :** Plaintiff, brings this action against the City of New York for its municipal liability in Defendants at 3(i-v) above, in their official and/or individual capacities, under 42 U.S.C. § 1983, 1988 and New York common law for unlawful imprisonment in violation of the Fourteenth Amendment of the U. S. Constitution and New York common law, for abducting her from her home under threat of force and causing her to be unlawfully detained and imprisoned for the purpose of an unnecessary psychological evaluation.

208.    **V :** Plaintiff, brings this action against the City of New York for its municipal liability in Defendants at 3(iv-v) above, in their official and/or individual capacities, under 42 U.S.C. § 1983 and 42 U.S.C. Chapter126 for failure to accommodate the disabled Plaintiff and violating her rights under the Americans with Disabilities Act (ADA).

209.    **VI :** Plaintiff, brings this action against the City of New York for its municipal liability in Defendants at 3(iv-v) above, in their official and/or individual capacities, under 42 U.S.C. § 1983 and 42 U.S.C. Chapter126 for failure to properly assess Plaintiff, and for using force or the threat of force to coerce compliance to actions that violated Plaintiff's rights when she was forcibly taken from her home; violating her due process in violation of the Fourteenth Amendment of the U. S. Constitution and disability law.

210.    **VII :** Plaintiff, brings this action against the City of New York for its municipal liability in Defendants at 3(iv-v) above, in their official and/or individual capacities, under 42 U.S.C. § 1983 for the use of excessive force with deliberate indifference to a

serious risk of harm to Plaintiff, in violation of the Fourth Amendment and New York Law.

211. **VIII :** Plaintiff, brings this action against the City of New York for its municipal liability in Defendants at 3(iv-v) above, in their official and/or individual capacities, under 42 U.S.C. § 1983 for failure to intervene when witnessing others violating Plaintiff's constitutional rights, in violation of the Fourth Amendment and New York Law.

212. **IX :** Plaintiff, brings this action against the City of New York for its municipal liability in Connor Coghlan, in his official and individual capacities, for unlawful search of Plaintiff's bag and electronic seizure of her papers without cause or warrant, in violation of The Fourth Amendment.

213. **X :** Plaintiff, brings this action against the City of New York for its municipal liability in Defendants at 3(i-v) above, in their official and/or individual capacities, under 42 U.S.C. § 1983, 1988 and/or New York common law for intentional and/or negligent infliction of emotional distress caused by the infliction of extreme physical pain, callous disregard for Plaintiff's wellbeing and endangering Plaintiff's physical person.

214. **XI :** Plaintiff, brings this action against the City of New York for its municipal liability in Defendants at 3(i-v), in their official and/or individual capacities, under 42 U.S.C. § 1983, 1988 and/or New York common law for defamation, with damage to reputation and causing extreme embarrassment, due to creating an unwarranted spectacle in the lobby of Plaintiff's residence, in front of friends, neighbors and her building staff and causing permanent damage to these relationships.

215.     **XII :** Plaintiff, brings this action against the City of New York for its municipal

liability in Defendants at 3(i-v) above, in their official and/or individual capacities, under

42 U.S.C. § 1983, 1988 and/or New York common law for retaliation, carried out with

malice, for the intended purpose of intimidating Plaintiff from filing this lawsuit and/or,

failing that, damage her credibility with regard to her claims.

216.     **XIII :** Plaintiff, brings this action against the City of New York for its municipal

liability under 42 U.S.C. § 1983, 1988 and/or New York common law for negligent

supervision and lack of appropriate training of: a) the representatives of the City

Commission on Human Rights, b)Police officers and c)FDNY-EMT's, which led to the

wrongful behavior of employees that gave rise to the aforementioned causes of action in

this complaint.

## JURY DEMAND

217.     Plaintiff demands a trial by jury on all questions of fact raised by this complaint.

## RELIEF

218.     Plaintiff seeks compensatory and punitive damages for the physical pain and

suffering she has endured due to CCHR's failure to perform. The debilitating, life

destroying, migraines that have stolen all peace and happiness from Plaintiff, have been

unnecessarily triggered and/or intensified by circumstances that should have been

brought to an end, had the City Of New York and CCHR taken care to uphold their

responsibilities in implementing and enforcing ADA and FHA laws. Instead, Plaintiff

continues to suffer the extreme physical pain of chronic migraines as a direct result of their biased refusal to offer Plaintiff equal protection under the law.

219.     Plaintiff seeks punitive and compensatory damages for the infliction of extreme emotional distress caused by CCHR's unlawful racial bias and related denial of service.

220.     Plaintiff seeks punitive and compensatory damages for the infliction of extreme emotional distress and prolonged physical pain associated with CCHR's callus disregard of Plaintiff's disabilities and her need of legal protection and government enforcement of the law.

221.     Plaintiff seeks punitive and compensatory damages for the intentional and negligent infliction of physical abuse, causing extreme prolonged pain and suffering, during Plaintiff's transport by NYPD and FDNY_EMT employees.

222.     Plaintiff seeks punitive and compensatory damages for the intentional and negligent infliction of extreme emotional distress caused by the physical abuse and reckless indifference of the disabled Plaintiff's safety and wellbeing during Plaintiff's transport by NYPD and FDNY_EMT employees.

223.     Plaintiff seeks punitive and compensatory damages for the intentional and negligent infliction of extreme pain, suffering and emotional distress caused by the refusal and failure to accommodate Plaintiff's disabilities during her transport by NYPD and FDNY_EMT employees.

224.     Plaintiff seeks punitive and compensatory damages for the intentional use of excess force by NYPD after Plaintiff volunteered to submit to their demands and posed no threat.

225.     Plaintiff seeks punitive and compensatory damages for the intentional and negligent infliction of extreme fear and terror, cause by her false imprisonment, when she was forcibly taken from her home and held against her will for an unnecessary psychological evaluation.

226.     Plaintiff seeks punitive and compensatory damages for the breach of her Constitutional rights by Officer Coghlan's warrantless search of her bag and electronic seizure of her papers.

227.     Plaintiff seeks punitive and compensatory damages for her loss of reputation and public humiliation caused by NYPD and FDNY-EMT employees creating a horrifying and totally unnecessary spectacle in the lobby of Plaintiff's residence, and making Plaintiff appear insane by subjecting her to extreme physical pain and then making a public showing of their contempt for her cries by rolling their eyes and acting like the Plaintiff's screams were due to a mental unbalance.  The incident has permanently affected Plaintiff's ability to live with dignity in her building.

228.     Plaintiff seeks punitive and compensatory damages for the act of retaliation that prompted the call to the police by CCHR.  It was vindictive and, in no reasonable way, could be construed as an attempt to offer any kind of aid or assistance to the Plaintiff. The sheer horror that ensued left Plaintiff with deep emotional scars.

229.     Plaintiff seeks punitive and compensatory damages for the fact that both the racial bias and the disregard for Plaintiff's disability needs have been a pattern of behavior displayed by CCHR, NYPD and FDNY-EMS with regard to Plaintiff.  It is a cultural problem and clearly due to systemic negligent supervision from the top of this municipality through all of it's agencies.

230.     Plaintiff seeks any other relief that this Court deems just and proper.


Dated: New York, New York
        January 20, 2026

                              Respectfully Submitted,


                              Kelly MacNeal
                              Pro Se Plaintiff
                              507 W 28th St
                              New York, NY 10001